IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No. 08-cv-00563-WYD-KMT

BARBARA K. DUBROVIN,

     Plaintiff,

v.

THE BALL CORPORATION CONSOLIDATED WELFARE BENEFIT PLAN FOR
EMPLOYEES;
THE BALL CORPORATION LONG-TERM DISABILITY COVERAGE PLAN, also known
as The Ball Corporation Long-Term Disability Plan for Salaried Employees, also known
as The Ball Corporation Long-Term Disability (LTD);
BALL CORPORATION, an Indiana corporation;
THE BALL CORPORATION EMPLOYEE BENEFITS ADMINISTRATION COMMITTEE;
and
BALL AEROSPACE & TECHNOLOGIES CORPORATION, a Delaware corporation,

     Defendants.

---

## ORDER

---

I.    <u>INTRODUCTION</u>

    THIS MATTER came before the Court on a hearing on April 28, 2010, on the

cross-motions for summary judgment pending in the case relating to the first claim for

relief seeking reinstatement of benefit payments under a long term disability plan [the

"LTD Plan" or the "Plan"] sponsored by Ball Corporation ["Ball"] for certain employees of

Ball and its affiliates.  This claim is governed by the Employee Retirement Income

Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ["ERISA"].[1]  On May 11, 2010,

---

[1] The parties have deferred resolution of the second claim for relief, seeking reinstatement of
Plaintiff's other employee benefits concurrent with reinstatement of her LTD benefits, as they agree that
resolution of this claim is contingent upon the ruling on the merits of Plaintiff's first claim.

Defendants filed supplemental briefing in support of their summary judgment motion. I now turn to the facts relevant to the ERISA claim and then address the merits of the claim.

II.    FACTUAL BACKGROUND

    A.    The Initial Decision to Grant LTD Benefits to Plaintiff

    Ball hired Plaintiff in early 1996 (Administrative Record ["AR"] 024, 077[2]) to work as a design engineer for its subsidiary, Ball Aerospace and Technologies Corporation ["BATC"]. Plaintiff asserts that her job was physically and intellectually demanding, and she drew upon her undergraduate and masters degree in mechanical engineering (*id*. 77) and experience with spacecraft design.[3]

    By mid-1997, Plaintiff began to experience illnesses with debilitating flu-like symptoms and severe fatigue. Work modifications were pursued. In early 1998 Plaintiff and Ball developed an arrangement for her to attempt to work from home but this arrangement did not last. By August 1999 Plaintiff asserts that the parties mutually recognized that she was disabled within the meaning of the Plan. Plaintiff received short term disability benefits between August 1999 and March 2000. (AR 077.)

    As to long term disability ["LTD"] benefits, Ball's LTD Plan states that "you will be eligible to receive [such] benefits if your disability is deemed 'total' by a physician." (AR

---

[2]  The AR refers to the Administrative Record tendered to the Court conventionally on June 2, 2008 (ECF No. 17). It also includes the Supplement to the Administrative Record submitted by Defendants on September 12, 2008 (ECF No. 49). Finally, it includes documents which Magistrate Judge Tafoya found should be part of the record when she granted in part Plaintiff's Motion for Supplementation of the Administrative Record by Order of December 30, 2008 (ECF No. 64). These documents were attached to her Order.

[3]  Plaintiff's job description and requirements are found in the AR at 31 and 145-46.

627-28.)  The Plan defines this eligibility under two categories of disability.  First, a claimant is eligible to receive LTD benefits if he or she is not able to perform his or her usual job during the first two years of the disability, *i.e.,* an "own occupation" standard.  (*Id.*)  After the second year, the claimant must be unable to perform any job for which he or she is reasonably qualified by training, education, or experience, *i.e.,* an "any occupation" standard.  (*Id.*)

Plaintiff applied for LTD benefits on February 2, 2000 (AR 028, 030), providing a medical narrative of her treatment history from April 1997-February 2000.  (*Id.* 033-36.)  She also provided medical records of laboratory and other tests from June 1997-June 1999 and clinical notes reflecting phone calls made to her doctors regarding her condition (no in-person exams appear to have been included).  (*Id.* 037-76.)

On March 15, 2000, Ball informed Plaintiff that the information provided did not contain any recent medical information (most was from early 1999 or prior).  (AR 016.)  She was asked to submit more current information for Ball to evaluate her claim of disability, including a medical narrative from her doctor regarding her condition, prognosis and "information on [her] ability to perform [her] usual job of Engineer."  (*Id.*)  Plaintiff responded by providing a note from her chiropractor stating that she was currently being treated for chronic fatigue syndrome ["CFS"], there has been no change in her condition and none is anticipated for the next six months, and her prognosis "remains guarded".  (*Id.* 15).  No clinical notes or medical records reflecting office visits or treatment were included.

On March 30, 2000, Ball informed Plaintiff by letter that while the chiropractor's note would be included in its decision making process, "the information provided is not

detailed enough to provide a clear picture of total disability nor is a chiropractor qualified to give a <u>medical</u> opinion of total disability."  (AR 14) (emphasis in original.)  Ball stated that before a ruling could be made, it needed "additional information from a medical or osteopathic doctor", including a medical narrative regarding Plaintiff's condition and changes in same, her prognosis, and information on her ability to perform her usual job of Engineer.  (*Id.*)

On April 13, 2000, Plaintiff saw treating physician Dr. Hammerly for the first time. (AR 476-77.)  The notes of the visit do not suggest any abnormal physical findings, but noted CFS, "sudden onset".  (*Id.*)  While Defendants assert that this reflects only Plaintiff's self-reported symptoms, it appears from the notes that Dr. Hammerly made a medical finding that Plaintiff had CFS.  (*Id.* 477, 12.)  The notes also indicate that lab tests were ordered to determine the underlying cause.  *(Id.* 12.)

On May 11, 2000, Dr. Hammerly wrote Ball that he had seen Plaintiff in his office on April 13, 2000, that he "reviewed her extensive history of health problems, medical evaluations, tests and treatment notes over the past three years", and that he ordered additional tests "to help ascertain the underlying cause of her chronic fatigue. . . ."  (AR 12.)  He stated that other than hormonal abnormalities which he was going to treat, he saw "no other obvious, treatable cause for her symptoms."  (*Id.*)  He further stated that "[o]nce optimal hormone levels have been achieved", which he thought would take four to six months, "Barbara will have reached maximal improvement from medical therapies".  (*Id.*)  "Until the hormone levels are corrected Barbara's inability to work due to fatigue and poor concentration can be expected to continue."  (*Id.*)  He concluded:

> Once the hormone levels have been corrected she will be either better (and able to work) or she will not be better. If Barbara's symptoms do not improve despite correcting the hormonal imbalances then the length of any future disability would be hard to predict (as we would not have any understanding of the underlying cause).

(*Id.*)

Contrary to Defendants' argument that Dr. Hammerly's findings were based only on Plaintiff's self-reports, the findings appear to represent a medical judgment based upon Dr. Hammerly's examination of Plaintiff and his statement that he reviewed Plaintiff's history, evaluations, tests and treatment. Plaintiff submits that Dr. Hammerly's letter explained her disability due to CFS, thus complying with Ball's request for a medical narrative describing her condition.

Plaintiff was granted LTD benefits under Ball's "own occupation" standard retroactive to March 7, 2000, based on Dr. Hammerly's opinion that she suffered from chronic fatigue and poor concentration. (AR 002-005.) Benefits were to be paid through September 6, 2000, at which time Ball stated it would need an update of Plaintiff's condition from her physician to determine if she was still eligible for benefits. (*Id.* 002.) Ball also stated that Plaintiff was obligated to provide it with periodic updates of her condition prepared by her physician and that it "reserve[d] the right to have an independent medical examination ["IME"] performed" at Plaintiff's expense. (*Id.*)

On November 20, 2001, Ball wrote Plaintiff stating that the file does not include information from the Social Security Administration ["SSA"] regarding Social Security Disability Insurance ["SSD" or "SSDI"] benefits and requesting a copy of the SSA's decision. (AR 098.) Ball stated that if Plaintiff had received a letter denying benefits, it was her obligation to pursue any reconsideration or appeals available to her. (*Id.*)

In December 2001 the SSA issued a decision finding that Plaintiff was not able to perform her past relevant work due to CFS but could perform other sedentary work in the national economy including such jobs as office helper, sedentary assembler and cashier II. (AR 86-91.) Accordingly, it found that she was not disabled and denied her claim for SSDI benefits. (*Id.*)

In March 2002, Plaintiff wrote Ball stating that she had fulfilled her agreement to seek SSDI benefits. (AR 81-82.) She also explained that she had found lawyers that were willing to represent her before the SSA but their fees would be automatically deducted from the amount awarded. (*Id.* 81.) Thus, she would have received 75% back pay and 100% forwards pay in a favorable decision. (*Id.*) She also stated:

> As agreed when my Ball disability was approved, I would turn over any SSD money to Ball. So, I contacted Ball to explain that this is what I would receive and be able to turn over. But I was told explicitly, by several people, that Ball would not accept less than 100%, and that if I didn't receive 100% from SSD, I would have to pay the other 25%. . . . Maybe you realize the difficult situation this put me in: if a lawyer won (he expected to) it would have been a financial hardship on me. . . . So, to be able to give the company the 100% demanded, I had to represent myself.

(*Id.*)

B.    The Administrator's Decision to Explore Whether Plaintiff Met the Change in Definition Applicable After 24 Months

In late 2001/early 2002 the Plan fiduciaries explored the change in definition ["CID"] applicable to LTD benefits after the first 24 months, from the "own occupation" standard to the "any occupation" standard. It is undisputed that the Plan's definition of disability would change in March 2002 after 24 months of benefits. Ball wrote Dr. Hammerly in December 2001 stating that it was unclear whether Plaintiff met the definition of "totally disabled" in the LTD Plan under the CID, stating that "[t]he plan's

definition of total disability (since she has been disabled for more than 24 months) is the ability to perform *any* job for which she was reasonably qualified by training, education, or experience" and noting that her position prior to her disability was Engineer II. (AR 212.) Ball asked Dr. Hammerly to provide a medical opinion on this issue by January 15, 2002, "[i]n order to avoid a break in benefit checks." (*Id.*)

Dr. Hammerly responded by letter of January 4, 2002, stating, "[a]t this time, and for the foreseeable future, Ms. Dubrovin is totally disabled from performing any job for which she is reasonably qualified by training, education, or experience." (AR 198.) Thereafter, according to Ball's records, Plaintiff was awarded LTD benefits due to CFS based on the "update from Milton Hammerly, M.D." (*Id.* 530.) The record indicates that this award was approved on January 29, 2002, less than 24 months from her disability date, and there is a handwritten note that the benefits were approved until May 31, 2002. (*Id.*) From this, it appears Ball approved the continuation of LTD benefits after the first 24 months with knowledge of the applicable CID. (*Id.*; *see also* AR 212.) In other words, LTD benefits were set beyond the first 24 months using the CID to the "any" occupation standard and Dr. Hammerly's January 2002 letter. (*Id.*)

Hartford took over claims administration in early 2003 and revisited the CID for disability. Acting as an independent claim manager for Ball, it reviewed the claim file and requested updated medical information from Plaintiff and Dr. Hammerly to evaluate whether Plaintiff met the "any occupation" standard. (AR 133, 148-49, 160, 200-01.)

In conducting its review of the file in March 2003, Hartford noted that Plaintiff had been receiving benefits since March 7, 2000 "due to chronic fatigue (?)", that on "1/29/02, PH approved claim for an addtl six months" and that "[n]o medical information

has been obtained since then." (AR 140.) The notes also indicate: "The med. info in file does not clearly state the primary dx." and "[t]he definition of disability is 24 month 00." (*Id*. 138.) "CID - 3/7/02. There is no indication of an AO determination in the file. Need AO review to confirm if TDAO. This claim may require an IME, FCE and/or UDC review." (*Id*. 140, 138.)

On April 8, 2003, Plaintiff signed an "Agreement Concerning Long-Term Disability Benefits" in which she agreed, among other things, "[t]o be examined by an independent physician, when requested by the Company or Claim Administrator, to determine my disability status under the terms of the plan. (AR 199.) The agreement stated that Plaintiff understood "that the Company has the right to reduce or stop my long-term disability benefit if I . . . "[f]ail to provide any information requested by the Company or Claim Administrator, which may be used to determine my ongoing disability status" or "[d]o not abide by the terms of this Agreement." (*Id*.)

On April 16, 2003, Hartford received a questionnaire that it had asked Plaintiff to complete. (AR 148, 192-96.) On May 6, 2003, Hartford received an Attending Physician Statement and Physical Capacities Evaluation from Dr. Hammerly that it had requested. (*Id*. 138.) Dr. Hammerly stated that Plaintiff's primary diagnosis was Chronic Fatigue Immune Dysfunction Syndrome ["CFIDS"], which I interpret to be roughly synonymous with CFS, and that "fatigue and cognitive dysfunction are the most disabling symptoms". (*Id*. 188-89.) He opined that Plaintiff's sitting, standing and walking were extremely limited, filled out the physical capacities evaluation Hartford provided, and stated that a return to work at her "regular occupation" was "Not anticipated". (*Id*. 188-191.)

After receipt of these documents, Hartford stated in its notes that "Dr. Hammerly represents that clmt has impairments. We need the med info to confirm clmt's functional capacity. This claim may require an IME. . . ." (AR 138.) Hartford also noted that Plaintiff's LTD benefits would end on July 31, 2003, which it extended to December 31, 2003. (*Id.* 138-39.)

In June 2003, Hartford received more information regarding Plaintiff's claim. (AR 147, 161-186.) This included lab results, a handwritten medical narrative by Plaintiff regarding her symptomology from mid-2002–2003, and a log of medications/ supplements she had been taking. (*Id.*) Despite Hartford's recognition of the diagnosis by Dr. Hammerly of CFIDS (*id.* 138), his medical findings including the fact that Plaintiff was totally disabled and the physical limitations he imposed in his Physical Capacities Evaluation which precluded any work, on June 24, 2003, Hartford's notes state that "there is NOTHING in these records indicating that claimant is disabled." (*Id.* 147.)

In July 2003, Nurse Fanita Wilson of Hartford reviewed the file and determined that a physician peer review should be conducted to determine restrictions and limitations based on Plaintiff's medical condition. (AR 145-46.) She also determined that Dr. Hammerly needed to be contacted for more information. (*Id.* 146.) She questioned why Plaintiff was not seeing an endocrinologist or psychiatrist and whether Plaintiff was receiving appropriate medical care. Finally, she asked, "Do the objective findings contained in the medical records support the EE's inability to perform the duties of all occupations either on a full time or part time basis?" (*Id.*)

In August 2003, Hartford sent Plaintiff's medical records and job description to a medical consultant, Dr. Dibble, for review. (AR 144.) He is a family practitioner with

Medical Advisory Group LLC ["MAG"].  Dr. Dibble did not examine Plaintiff, but completed a report on August 21, 2003, documenting his review of the medical records. (*Id.* 134-37.)  He noted that Plaintiff has CFIDS as well as hypothyroidism and hypoadrenalism (*id.* 134), and that the record does not give evidence of any diagnosis other than simple hypothyroidism.  (*Id.* 136.)  He also observed that the lab tests and physical exams showed no other abnormalities, nor was Plaintiff being treated for any. (*Id.* 134-37.)  While the tests/ exams were negative, Plaintiff asserts that the absence of positive findings is part of the diagnosis of exclusion for CFIDS.  It does not appear that Dr. Dibble addressed that issue in his report.

Dr. Dibble also noted that he discussed Plaintiff's condition with her physician Dr. Hammerly, a general internist.  (AR 135-36.)  According to Dr. Dibble, Dr. Hammerly told him that Plaintiff's fatigue and cognitive symptoms were "very subjective" and that there had been no formal evaluation of her physical capabilities or fatigue symptomology relative to job performance or endurance.  (*Id.*)  Dr. Hammerly also purportedly told Dr. Dibble that it was not part of his practice to make assessments of work capacity, and did not identify any physical limitations Plaintiff had that might interfere with sedentary employment.  (*Id.* 136.)  Finally, Dr. Hammerly purportedly told Dr. Dibble that Plaintiff had not had a formal psychiatric evaluation to rule out depression/mental illness, and that he had considered a diagnosis of obsessive compulsive disorder at various times.  (*Id.*)

Dr. Dibble concluded in his report, "[t]here has been no evidence in the record of any healthcare related issue that has not been properly addressed" and "[t]here is no diagnosis. . . that would preclude [Plaintiff] from the physical demands of Sedentary

Level employment." (AR 136.) He does not reference Dr. Hammerly's diagnosis of CFS or CFIDS in his conclusion, even though earlier in his report he recited the fact that she has this impairment. (*Id.* 134.) Further, Dr. Dibble recited an excerpt from Dr. Hammerly's attending physician statement and physical capacities evaluation report in which he said that Plaintiff was capable of the activities of sedentary level employment only "three hours daily". (*Id.* 135.) Yet he concluded that "[t]here is . . . no evidence in the record of any physical limitation that would preclude her from undertaking the demands of Sedentary-level employment." (*Id.* 136.)

In September 2003 Dr. Hammerly responded to Dr. Dibble's report, stating that it was "fine" except that (1) it would be "inaccurate to say that Barbara Dubrovin has not had a formal evaluation for her fatigue since she has had extensive testing over the past few years for possible causes of this" and (2) his "casual" mention of the possibility of obsessive compulsive disorder was not something he thought should be included in the record until she had an official psychiatric evaluation. (AR 152, *see also* 141.)

Also in September 2003, Defendants evaluated an independent medical review service, Medical Director Solutions, L.L.C. ["MDS"], to assist in the claim process. (Defs' Mot. for Summ. J. and Br. in Supp. ["Defs' Mot."], Ex. C-2, Second Decl. of Linda L. Berntson ["Berntson Second Decl."], ¶¶ 3-4, Ex. E, Decl. of Barry Mascarenas ["Mascarenas Decl."], ¶¶ 3-5.) Defendants assert that this evaluation included a confidential "trial" review of a claimant's file in order to allow the Plan to assess the quality of the services of MDS. (*Id.*) Plaintiff's file was provided to MDS as part of this assessment, in part because the Plan had already received a medical review from Dr. Dibble which would be used to assess the quality of MDS' record review. (*Id.*)

In September 2003 Dr. Nudelman, the physician from MDS who reviewed Plaintiff's file, purportedly determined that her medical records did not contain objective medical tests or evaluations demonstrating that she was unable to function in a work setting. (Def.'s Mot., Ex. D, Decl. of Mitchell Nudelman, M.D., ¶ 2.) Copies of Dr. Nudelman's report and the file about this review were not kept on file either by MDS or Ball, purportedly because this was merely a "trial" effort by MDS for evaluative purposes only. (Defs.' Mot., Berntson Second Decl., ¶ 4; Mascarenas Decl., ¶ 3.) Thus, Dr. Nudelman's report from September 2003 is not in the administrative record, even though Ball stated in some of its documents that the report was relied on to cut off Plaintiff's benefits. (AR 576, 759.)

On October 8, 2003, Ball sent a letter to Plaintiff explaining that, based upon Dr. Dibble's medical review and his conversation with Dr. Hammerly, under the "any occupation" standard Plaintiff no longer met the Plan's definition of total disability ("unable to perform any job for which [she was] reasonably qualified by training, education or experience."); therefore, her LTD benefits would be suspended as of October 31, 2003. (AR 523-524.) No further details were given as to the reasons for the suspension of benefits. The letter also explained Plaintiff's appeal rights. (*Id.*) In this letter Ball confirmed that it was relying upon the definition of disability in the LTD Plan as of March 7, 2000, whereby the Plan ensures receipt of LTD benefits if her disability was "deemed total by a physician." (*Id.* 430, 523.) Plaintiff asserts that even though the Plan requires the "specific reasons for the denial" and other specifics (*id.* 652), no details were actually given in that letter.

In October 2003, Plaintiff requested "a copy of what is in my file, so I know what information you already have and what may be missing." (AR 516.) Ball sent "copies of information from your . . .(LTD) file, which supports our decision to terminate your LTD benefits as of October 31, 2003." (*Id.* 517.) Plaintiff states that she was only provided four pages (one page from Hartford's claim examiner's notes from mid-2003 and three pages from Dr. Dibble in August 2003). (*Id.* 518-21.) Ball's investigative plans were not provided, which were later found in part in the claim file. (*Id.* 522, only p. 4 appears.)

C.    Plaintiff's First Appeal

Plaintiff appealed the termination of her benefits, through counsel, in December 2003. (AR 423-25.) Her appeal included a six-page medical narrative written by Plaintiff in November 2003. (*Id.* 426-29, 431-32.) It also included medical information from 2000-2003, including a number of tests. (*Id.* 433–511.) Defendants point out that with a few minor exceptions, these tests were uniformly negative indicating no findings of significance. *Id.* Again, Plaintiff points out that they were part of the extensive diagnosis of exclusion for CFS.

In December 2003, Ball again utilized Dr. Nudelman's services, forwarding Plaintiff's medical records to him for a medical peer review. (AR 576.) It appears that this was an official use of Dr. Nudelman's services, and was no longer a "trial" by Ball for evaluative purposes. Ball's letter to Dr. Nudelman reminded him that it had previously sent Plaintiff's file to him for a review, and that he had opined that there was not sufficient clinical documentation to support her claim for LTD. (*Id.*) The letter also stated that "[a]s a result of your reply (which I interpret to mean his September 30, 2003

report), Barbara Dubrovin's LTD was suspended as of October 31, 2003", and advised him that she had appealed that decision.  (*Id.*)

On January 9, 2004, Dr. Nudelman completed his medical record review, finding:

> After careful consideration of the medical records submitted for my review, it is my opinion within reasonable medical certainty at this time, that there is not sufficient objective clinical documentation submitted so as to support the claimant's assertion that she has been unable to perform the material and substantial duties of her own or any other occupation on the basis of Chronic Fatigue Syndrome or any other medical condition...metabolic, immunologic or otherwise.

(AR 573-75.)  This report was not shared with Plaintiff until much later.

Dr. Nudelman explained that the medical evidence did not show that Plaintiff met the Center for Disease Control ["CDC"] criteria for CFS.  (AR 573.)  He observed that the original 1998 diagnosis appeared to be related to the presence of the Epstein-Barr virus, which the CDC had determined is not related to CFS.  (*Id.*)  Further, he explained that other potential conditions, including psychiatric disorders, must be ruled out or excluded as a prerequisite to accurately diagnosing CFS.  (*Id.*)  Dr. Nudelman noted that Plaintiff "has a litany of often stress related conditions, for which she has either not undergone appropriate medical evaluation and treatment, including . . . tinnitus, syncope, chronic headache, insomnia and sleep disturbance, cognitive dysfunction, for examples, all of unknown etiology."  (*Id.* 574.)  As to the cognitive impairment, he noted that both a neurological evaluation and neuropsychological testing would be required as well as a sleep study.  (*Id.*)

Dr. Nudelman concluded that rather than CFS, " it is far more likely that the claimant's primary condition is Mental/Nervous (M/N) in nature", that a medical claims history should be run and that if the claims history "supports the need, the claimant

should be referred for medical case management." (AR 574-75.) He also stated, "[a]t this time I see no need for any IME or FCE. This may become necessary at a later date." (*Id*. 575.) Finally, Dr. Nudelman suggested surveillance, maybe in conjunction with an IME, and examination of "psychosocial" issues. (*Id*.) Dr. Nudelman does not state in the letter what medical records Ball actually shared with him.

According to the Plan, the appeal "will be reviewed by a Plan fiduciary who had no role in the initial claim denial and the review will be an independent one without giving the original denial any special consideration. If a medical judgment is involved, the person reviewing your appeal will consult with a health care professional who has appropriate training and expertise in the field of medicine involved in the medical judgment *and who had no role in the initial claim denial*." (AR 653) (emphasis added). It appears that Ball did not comply with this directive since Dr. Nudelman was involved in the initial review and in the appeal. Again, while Ball disputes that Dr. Nudelman's report from his initial review was relied on to make its decision in October 2003 to suspend LTD benefits, there is record evidence to the contrary. Further, as discussed previously, when Ball utilized Dr. Nudelman's services on the appeal, it reminded him that he had previously reviewed Plaintiff's file and had opined that there was not sufficient clinical documentation to support her claim for LTD benefits.

On January 30, 2004, relying on the review of Dr. Nudelman, Ball wrote Plaintiff informing her that there was "inadequate objective documentation to support the assertion that you are disabled by Chronic Fatigue Syndrome or any other medical condition". (AR 611.) Ball stated that "the denial is based on the plan provisions that you do not meet disability guidelines as being unable to perform any job for which you are reasonably

qualified by training, education or experience". (*Id.*)  Again, Plaintiff asserts that the letter did not provide the specifics it was required to under the Plan.

On March 9, 2004, Plaintiff requested reconsideration of the termination of her LTD benefits.  (AR 720, renumbered as AR 1000.)  She enclosed a March 8, 2004 letter from Dr. Hammerly, a purported expert in CFS/CFIDS, opining that Plaintiff could not work at that time and notes from an office visit that month.  (*Id.* 1000-1003.)  Dr. Hammerly indicated in the March 8 letter that all of Plaintiff's symptoms including fatigue, "disrupted sleep, nausea, abdominal pain, muscle cramps, cognitive dysfunction ('brain fog'), and recurrent sore throats, swollen glands and low-grade fevers . . . seem to flare simultaneously when she attempts to engage in physical or mental activity for more than short periods of time (2 hours of sitting or 15 minutes of standing)".  (*Id.* 1001.)  He concluded that CFIDS is a "diagnosis of exclusion" and that "[a] person with her symptoms and no pathology demonstrated on objective testing qualifies for a diagnosis of CFIDS." (*Id.*)

Ball acknowledged that these documents provided by Plaintiff on March 9, 2004 (AR 1000-1003) were missing from the administrative record when it was submitted to the Court.  Ball has not explained the reason for the missing evidence, particularly since a summary of a meeting of Ball's EBAC from March 2004 reflects its review of these missing documents (noting the letter from Dr. Hammerly).  (*Id.* 761.)

On March 23, 2004, EBAC reviewed Plaintiff's claim and authorized sending Plaintiff to an IME to fully assess her condition and ability to work.  (AR 759-61.)  The notes from this meeting reflect that the decision to cut off benefits on October 31, 2003 "was based upon an independent medical file review conducted by" Dr. Nudelman's company MDS,

reflecting a reference to and citation from the missing report of September 30, 2003 by Dr. Nudelman. (*Id.* 759.) The minutes also state that "the file received from [Plaintiff's] attorney was sent for a second review. Nothing in the second file review changed MDS's opinion." (*Id.* 760.) This referenced the January 2004 report of Dr. Nudelman.

Plaintiff asserts that nothing in the EBAC minutes or the claim appeal summary shows that EBAC decided that an IME was actually "necessary." (AR 759- 60.) EBAC also acknowledged in its minutes that Plaintiff had told Ball that she felt the Plan was "requiring her to go against a knowledgeable doctor's advice and worsen her health." (*Id.*) The evidence Plaintiff presented in March 2004 emphasized progressive deterioration and that she could only be active for brief times. (*Id.* 1000.) Plaintiff also expressed concerns with doctors not familiar with CFIDS. (*Id.*)

On March 30, 2004, Ball sent a letter stating that EBAC had recommended that Plaintiff participate in an IME. (AR 571.) It asked Plaintiff to go to an IME to be scheduled by Ball, and stated, "Based on the results of the IME, a final decision will be made with regard to your eligibility in the LTD Plan." (*Id.*) The letter indicated that Plaintiff would be contacted as to the date and time of her IME, and that she would be able to change the date if she needed to do so. (*Id.*) Nearly a month in advance, on April 9, 2004, Plaintiff was informed that she was to meet with Dr. Monti Atkinson, Ph.D., on May 4, 2004 from 1:00 – 5:00 pm and on May 11, 2004 from 1:00 – 5:00 pm for an IME. (*Id.* 416.)

On May 3, 2004, one day before the first part of the IME set for May 4, Plaintiff contacted the Plan and left a voice mail message. Per the transcript of the message, Plaintiff said that she would not be able to arrange transportation to the scheduled exam and that she would probably have the same problem with any "similar long psychological

appointment". (AR 409.) She stated that she was willing to cooperate, but would not endanger her health in the process. (*Id.*) She concluded in the message, "You have the authority, I hope you do, I hope we can continue to work together to get me back at the Company as soon as I am physically recovered. Give me a call. . ., but I will not be able to arrange transportation to a long, all afternoon psychological exam; next week or any other week. Thank you." (*Id.*)

Ball offered to provide transportation so Plaintiff could attend. On May 4, 2004, the day of the IME, Plaintiff stated that in a message that she would not be able to make it to the appointment so Ball did not need to arrange transportation. (AR 409-410.) Ball asserts that Plaintiff provided no reason for her refusal to participate in the IME or for her decision to breach the LTD Agreement signed in April 2003 in which she agreed to attend any IMEs Ball requested. (*Id.* 199.) Plaintiff denies that she failed to failed to cooperate, as she told Ball that she was not able to participate in such a long IME because it would damage her health per her voice mail message of May 3, 2004. Further, she states that the medical evidence indicated that such an IME was not reasonable and was not with a physician as required by the Plan.

It appears that the Plan administrator subsequently called and left a message for Plaintiff regarding the IME scheduled for May 11, 2004. (AR 416, 407.) Plaintiff did not attend that IME either. Ball's notes indicate those appointments were cancelled. (*Id.* 416.) Ball asserts that Plaintiff thereafter neither contacted the Plan administrator nor made any further effort to comply with the requirements to participate in an IME. (*Id.* 407.)

On June 1, 2004, Ball wrote Plaintiff notifying her that the appeal on her LTD claim had been denied. (AR 406-08.) The letter informed Plaintiff that the IME with Monti

Atkinson was scheduled based on Dr. Nudelman's January 9, 2004 report, and that the appeal was being denied "because [Plaintiff] failed to cooperate with the reasonable request that [she] attend the IME appointments." (*Id.* 406.) The letter also stated:

> The LTD Plan language specifically states: "After the second year, you must be unable to perform any job for which you are reasonably qualified by training, education or experience in order to continue receiving LTD benefits." As the participant, you must establish eligibility for benefits from the LTD Plan, including that you meet this definition of total and permanent disability. Without having expert opinion based on appropriate findings from the IME mentioned above that you are permanently and totally disabled, you have not established your eligibility and the Committee has no choice but to determine that you are not qualified for continued LTD benefits.

(*Id.*)

Ball's letter denying the appeal concluded by stating that if Plaintiff was "willing to attend the IME and any follow-up IMEs that might be needed and agree to extend the regulatory time period within which the Committee is required to decide your appeal, this denial decision will be held in abeyance." (AR 408.) If this was not acceptable, Ball advised that Plaintiff had exhausted the administrative review process and was free to file a lawsuit if she disagreed with the Plan's decision. (*Id.*)

Aside from notifying the Plan administrator of a change of address and her intention to pursue more care, Plaintiff had no contact with Ball for over one year. (AR 404.)

D.    The Second Appeal

On September 13, 2005, more than 15 months after the administrator denied her appeal, Plaintiff, through new counsel, contacted the Plan requesting an "appeal and/or request for reconsideration and/or new application" for LTD benefits. (AR 368-69.) The letter noted the offer in Ball's letter of June 1, 2004 as to the first appeal that it would hold the denial decision in abeyance if Plaintiff agreed to attend the IME and any follow-up IMEs

-19-

that might be needed and to extend the regulatory time period for deciding the appeal and "confirm[ed] that Plaintiff was willing to do this". (*Id.* 368.)

The letter from counsel attached additional medical evidence consisting of two IME reports of Plaintiff obtained by the SSA from Gregory Denzell, D.O., dated May 17, 2005, and John Burt, Ph.D., dated May 26, 2005. (AR 368.) Dr. Denzell agreed with the CFS diagnosis and imposed functional limitations stated in the letter wherein Plaintiff could not work more than four hours a day. (*Id.* 368-369.) Dr. Burt was a psychological consultant who found that Plaintiff was being truthful in her exam with him and that while, cognitively she was in the high average range of functioning, given her high level of education and job history, it was probable she had declined in certain cognitive areas including "Working Memory, Visual Memory, and psychomotor functioning." (*Id.* 369.)

In correspondence dated December 21, 2005, Plaintiff's counsel answered questions from Ball why Plaintiff was previously unwilling to participate in the IME. (AR 365-66.) He stated that Plaintiff had explained that she was physically unable to undergo long testing such as that proposed by Ball and that she objected to an IME for psychological testing when her diagnosis was based on a physical condition of CFS, not psychiatric symptoms. (*Id.* 365.) Indeed, the letter stated that if depression was Plaintiff's only problem, she could probably work full time by taking antidepressants. (*Id.*) Counsel also stated in the letter that he had advised Plaintiff "that it would be in her best interests to undergo appropriate medical evaluations, which may be asked by Ball Corporation." (*Id.*) The letter concluded, "[i]n order to provide you with the information you need to properly evaluate Ms. Dubrovin's claim, I would suggest you have her examined by an objective

physician who is very experienced with chronic fatigue, fibromyalgia, and related symptoms" and that if Ball needed anything else, to let him know. (*Id.*)

Ball asserts that although the Plan's terms did not provide for another appeal, the Plan Administrator, in its discretion, allowed Plaintiff the opportunity to appeal. This was conditioned on her participation in an IME and any follow-up IMEs that were deemed necessary by Ball.

On January 31, 2006, Plaintiff was notified that an independent psychiatric examination ["IPE"] was scheduled with psychiatrist, Dr. Theron Sills, for February 15, 2006. (AR 381.) On February 23, 2006, Plaintiff's attorney informed Ball that Plaintiff failed to attend the IPE due to inclement weather conditions, that she had contacted the doctor's office to let them know and the office told her it was fine to reschedule, and asked what needed to be done to reschedule the appointment. (*Id.* 380.) Counsel also stated, "[m]y client is willing to cooperate and apologizes for any inconvenience." (*Id.*)

In response, Ball disputed that the weather was adverse and requested reimbursement for the cost of the IPE, but stated that it would reschedule it. (AR 378.) Plaintiff's counsel replied by stating that the roads were hazardous on the day of the IME that Plaintiff failed to attend, and attached copies of weather related pages from various newspapers to substantiate that claim. (*Id.* 371-376.) Ball rescheduled the IME for March 20, 2006. (*Id.* 370.) Before the appointment Ball rescheduled the IME again due to Plaintiff's concerns about adverse weather conditions. (*Id.* 371.) The IME was rescheduled to April 17, 2006. (*Id.* 344.)

Plaintiff attended the third scheduled IME in April 2006. The psychiatric assessment by Dr. Sills concluded that Plaintiff did not suffer from any psychiatric disorder that would

prevent her from working. (AR 334-43.) Plaintiff asserts that this constituted the IME that Ball claimed it needed. She also asserts that Ball withheld the report from her for two and one half months, until August 8, 2006.

The Plan forwarded the results of the psychiatric assessment to Dr. Nudelman (involved now for a third time in the case) to review and determine whether the findings changed his prior opinion that there was insufficient medical evidence demonstrating that Plaintiff was unable to perform any occupation for which she was qualified. On June 15, 2006, Dr. Nudelman issued a report that the psychiatric assessment did not change his prior opinion. (AR 311-15.) In this report, Dr. Nudelman stated, contrary to the reports of Drs. Sills and Burt, that "I am still of the opinion that the claimant does have an underlying psychiatric condition". (*Id*. 312-313.) In other words, while Ball's consultant Dr. Sills had ruled out a psychiatric condition, Dr. Nudelman insisted there was one. (*Id*.) Indeed, he noted that "Dr. Sills' evaluation is essentially nothing more than an interview with the patient, in which he simply accepts the claimant's self-reported symptoms and medical history as factual." (*Id*. 313.) Dr. Nudelman also noted that Plaintiff had still not complied with a request for additional medical records, and that once those are received and reviewed, "it <u>might</u> be necessary [to] schedule an independent psychological evaluation with a full battery of tests." (*Id*. 314) (emphasis in original.)

On June 20, 2006, an internal e-mail of Ball questioned whether to "share the information received" and stated, "[o]nce we discuss my questions which we sort have done already, are we ready to send the denial?" (AR 320.)

On that same date, Plaintiff's counsel wrote Ball advising that a hearing on Plaintiff's social security claim was set for July 17, 2006, and requesting a copy of the IME results as

soon as possible so that they were available for the hearing. (AR 295-96.) The letter also detailed the functional restrictions imposed by Dr. Hammerly in his Residual Functional Capacity Assessment which noted, among other things, that "Conversation greater than one hour causes fatigue & cognitive dysfunction." (*Id.*) Counsel also sent another letter to Ball asking for a copy of the IME results for the SSA hearing. (*Id.* 319.)

Thereafter, even though Dr. Sill's IPE ruled out mental illness as a cause of Plaintiff's inability to work (AR 334-43) and Dr. Burt had commented on some probable cognitive deficits in the SSA proceeding, the Plan Administrator scheduled a neuropsychological IME to assess Plaintiff's cognitive functioning. This was done according to Ball because Dr. Hammerly had identified cognitive dysfunction as a basis for her inability to work (*id.* 191, 1001), and Dr. Nudelman's January 2004 review recommended neuropsychological testing to evaluate cognitive functioning. (*Id.* 257, 514.)

On July 14, 2006, Plaintiff was informed that an independent neuropsychological evaluation was scheduled for her on August 9, 2006. (AR 291.) This was scheduled from "8:00 AM - 5:00 PM (approx)" with Gregory Thwaites, who is not a physician.

On August 1, 2006 Plaintiff's counsel informed Ball that Plaintiff had received a favorable SSDI decision and, because SSA found her disabled due to CFS, not "psychological factors," the neuropsychological evaluation was irrelevant and unreasonable, particularly since Plaintiff had already undergone a psychiatric IME which despite requests had not been provided to Plaintiff. (AR 261-262.) The letter thus asked that the IME be cancelled. (*Id.*) The letter also stated that "due to Ms. Dubrovin's disability, chronic pain and related symptoms, she is unable to participate in any 8 hour neuropsych

(or other type of) evaluation." (*Id.* 262.) The letter asked that the LTD benefits be restored based upon the SSDI findings. (*Id.* 261-62.)

On August 7, 2006, Ball responded asking counsel to forward the SSDI written findings to Ball and stated that "any information used for the social security disability appeal may be helpful in the Company's determination of continued Long-term Disability Benefits . . . ." (AR 260.) However, Ball stated that its disability determination "is not contingent upon or determined by an approval of any Social Security Disability award." (*Id.*) "Therefore, the Company requires that Ms. Dubrovin attend the scheduled neuropsychological evaluation on August 9, 2006, at the stated time." (*Id.*) The letter concluded, "[o]nce the information has been reviewed, along with the results of the upcoming evaluation, we will inform Ms. Dubrovin of the Company's decision" and "will be more than willing to share the reports from the IME evaluations." (*Id.*)

On August 8, 2006, Plaintiff's counsel responded that Plaintiff would not attend the IME, as she was not "physically able" to participate in the eight hour exam. (AR 258.) He stated that Plaintiff had cooperated fully with Ball in its request for medical records and a psychological evaluation. (*Id.*) "In contrast, Ball has failed to act reasonably, first by refusing to send . . . a copy of the results of the psychological evaluation which was done on April 17, 2006, and second by insisting on an 8-hour neuropsychological evaluation despite having received information that this would be physically and emotionally harmful to Ms. Dubrovin." (*Id.*) Counsel asked that the IME be cancelled, that the report of the psychological evaluation be provided, and that Ball "please explain the basis for your imminent need of a neuropsychological evaluation". (*Id.*) Counsel's letter concluded, "[i]t would seem more reasonable to await receipt of the written decision of the [SSA] and only

then determine whether a neuropsychological evaluation is needed in order to determine Ms. Dubrovin's disability under the long term disability policy." (*Id.*)

Ball responded by letter of August 8, 2006, stating "[t]he participant in Ball Corporation's long term disability benefit plan has the responsibility to prove disability under the plan according to its standards." (AR 257.) It stated that it was enclosing "all the reports we have including the final report from Dr. Mitchell Nudelman which summarizes all the findings" and "states that the findings are inconclusive." (*Id.*) The letter states that this is the reason Ball requested the scheduled neuropsychological evaluation set for August 9, 2006. (*Id.*) The letter concluded:

> Ball Corporation has acted entirely within reason in its efforts to have your client fully evaluated for her opportunity to establish her eligibility for benefits. Without having a physician's statement that she is unable to attend the evaluation, we expect her to appear for her evaluation at the appointed time.

(*Id.*)

In issuing this letter, Ball ignored the fact that Plaintiff's treating physician Dr. Hammerly had previously stated that her symptoms are "aggravated by any physical or mental activity that engages her for more than two hours" (*Id.* 433) and the other medical evidence from him in the file detailed above.

Plaintiff's attorney responded to Ball's letter on the same day, August 8, 2006, and stated, as previously advised, that Plaintiff was unable to participate in an 8-hour evaluation of any type, including the neuropsychological evaluation scheduled for the next day. (AR 254.) He also stated that it was unfortunate that Ball had rejected his suggestion to await receipt and review of the SSA's report which he anticipated would contain specific findings that Plaintiff meets all the CDC criteria for a diagnosis of CFS and that she is totally and

permanently disabled as a result. (*Id.*) He then stated, "[u]nder the circumstances, it seems unreasonable for Ball to insist upon a "medical opinion that she is unable to attend". (*Id.*) Nonetheless, the letter stated that Plaintiff had contacted her physician, that it was impossible to forward to Ball her physician's statement regarding her participation in the evaluation set for tomorrow, and that Ball should cancel that appointment. (*Id.*) Counsel concluded the letter by assuring Ball that Plaintiff "will continue to cooperate with all reasonable requests from Ball regarding her application for disability benefits." (*Id.*)

Ball responded the same day by e-mail stating that the IME had been scheduled for over a month and that if Plaintiff failed to attend it would request reimbursement for a cancellation fee. (AR 252.) It also stated that "If Ms. Dubrovin has limitations, the examining physician should take this into consideration and conduct his examination accordingly and document such in his findings." (*Id.*) "At this late date, the Company has not taken any steps to cancel the appointment and will contact [sic] the IPE tomorrow." (*Id.*)

Plaintiff ultimately did not attend the neuropsychological IME on August 9, 2006. Ball asserts that this was a breach of the LTD Agreement and a reneging on the September 2005 agreement that she would participate in IMEs requested by Ball if it provided her a second appeal opportunity. The failure to attend resulted in a $2,500.00 fee expense to Ball which it claims Plaintiff is responsible for.

On August 15, 2006, the SSA issued its written opinion finding Plaintiff disabled as of January 4, 2002. (AR 230-34.) The administrative law judge ["ALJ"] found Plaintiff's testimony credible and that her "reported limitations are fully supported by the opinions and medical records from her treating physicians Dr. Hammerly ... and Dr. LaBlair ... and with

the opinion of consultative examining physician Dr. Denzel, that she should be restricted from work activity beyond 4-hour shifts." (*Id.* 233.) The ALJ observed that Plaintiff had not performed her past relevant work and could not do so since her functional limitations did not allow her to work for 8 hours a day, 5 days a week or an equivalent schedule. (*Id.)* The ALJ found that she suffered from a severe impairment, CFS, which caused significant limitations in her ability to perform basic activities. (*Id.* at 232.) Finally, he found that Plaintiff could not perform sedentary work (as she had the functional capacity for less than a full range of such work) and could not perform sustained full time work. (*Id.* 233.)

On August 30, 2006, Plaintiff's attorney wrote Ball enclosing a note, dated August 15, 2006, from Dr. Hammerly stating that Plaintiff had been diagnosed with CFS and that her symptoms seem to flare when she attempts to engage in physical or mental activities for more than short periods of time, thus the neuropsychological IME was "ill-advised if not contra-indicated." (AR 222-24.) Dr. Hammerly also stated, "[f]rom a medical perspective it would seem to make more sense to break down this prolonged, evaluation into a series of shorter exams that would be less likely to aggravate [Plaintiff's] symptoms." (*Id.* 223.)

In his letter, Plaintiff's counsel stated that Dr. Hammerly confirmed that Plaintiff could not have participated in the neuropsychological IME, and reiterated that Plaintiff "will participate in any reasonable and appropriate 'independent' medical evaluations requested by Ball, so long as such exams, evaluations or tests do not cause an undue physical or emotional hardship on Ms. Dubrovin." (AR 222.) Counsel also stated, however, that before scheduling any further evaluations, Ball should review the fully favorable decision from SSA. (*Id.*) "It would appear to a reasonable observer that the SSD award, with cited

medical support, fully meets Ball's LTD policy requirements for total disability." (*Id.*) Thus, he asked that Ball promptly determine that Plaintiff is totally disabled under the Plan.

Also on August 30, 2006, Plaintiff supplied Ball with the SSA's favorable disability decision dated August 15, 2006. (AR 222-245.) On September 7, 2006 the "Notice of Award," reflecting the calculations by the SSA, was provided to Ball. (AR 665-71.)

On September 18, 2006, Ball wrote to Plaintiff stating:

> We have received the Social Security Disability determination that was sent with the letter from your attorney. . . . Although this approval has been received, we will not approve your Long Term Disability Benefit through Ball Corporation due to the fact that you did not attend the scheduled IPE appointment with Dr. Thwaites on August 9, 2006.
>
> As indicated in the Long Term Disability Plan, on page 5, "Ball may require that an independent doctor examine you." Failure to meet the Plan requirements, disqualify you from being eligible for any Long Term Disability.
>
> Therefore, this concludes any further correspondence; this claim is closed. The charge incurred for your "No Show" appointment was $2,500.00, we look for reimbursement of this cost by October 1, 2006.

(AR 221.)

Represented by new counsel, Plaintiff filed this lawsuit.

III.     Standard of Review, Evidence to be Considered and Conflict of Interests

A.     Standard of Review

I first address the standard of review of the summary judgment motions at issue and then address the standard of review applicable to the Plan administrator's decisions. According to the Tenth Circuit, where the parties in an ERISA case both move for summary judgment, "'summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor.'" *LaAsmar v. Phelps*

*Doge Corp. Life, Accidental Death & Dismemberment and Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (quotation omitted).

I now turn to the Plan to determine the standard of review applicable to the decisions at issue. Under the LTD Plan, the Plan Administrator has "complete and unfettered discretion in both interpreting the terms and provisions of the Welfare Benefit Plan," and "the Plan Committee shall also have the same discretion in determining, in the case of any benefit, option, right, feature or matter contingent on criterion set forth in the Plan, whether such criteria have been met, including, but not limited to, discretionary authority to determine eligibility for benefits. . . ." (AR 707-08.) This document says that it governs the rights and benefits of persons who were employees on or after November 20, 1986 (this includes Plaintiff), and appears to incorporate the Employee Benefit Plans. (*Id.* 696-97.)

As stated by the Supreme Court, "a denial of benefits challenged under § 1132(a)(1)(B) [ERISA] is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 1155 (1989). "Where the plan gives the administrator discretionary authority", the court employs "a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious.'" *LaAsmar*, 605 F.3d at 796 (quotation omitted); *see also* Magistrate Judge's Order on Plaintiff's Motion to Allow Discovery, p. 4 (ECF No. 65 filed December 31, 2008). "Under this arbitrary-and-capricious standard, the court's review is limited to determining whether the interpretation of the plan was reasonable and made in good faith.'" *Id.* (quotation omitted). The parties both agree that the Plan Administrator's decision is subject to an arbitrary and capricious standard of review.

B.    Whether the Level of Deference Should Be Reduced

Plaintiff asserts that the arbitrary and capricious standard of review is subject to a significant reduction in deference because of conflicts of interest and procedural irregularities.  The Supreme Court recently clarified how a court must evaluate a conflict. It first noted that where the plan administrator is a professional insurance company, a conflict exists.  *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S. Ct. at 2349-50 (2008).  *Glenn* then turned to "the question of 'how' a conflict should 'be taken into account on judicial review of a discretionary benefit determination.'"  *Id.*, 128 S. Ct. at 2350 (quotation omitted).  It held that the *Firestone* requirement that a conflict should be weighed as a factor in determining whether there is an abuse of discretion "does not imply a change in the standard of review from deferential to *de novo* review."  *Id.*  Further, *Glenn* did not believe it was "necessary or desirable for courts to create special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict."  *Id.* at 2351.  Instead, "*Firestone* means what the word 'factor' implies, namely, that when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one."  *Id.*

*Glenn* further held:

In such instances, any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance. The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing

management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*Id.*

Based on *Glenn*, the Tenth Circuit held that the court must "dial back" the deference given to the administrator if it is operating under a conflict of interest. *Weber v. GE Group Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008). *Weber* held that "[t]his approach mirrors the *Glenn* Court's method of accounting for the conflict-of-interest factor." *Id.* at 1010-1011. That approach calls for the court to decrease "the level of deference [given to the conflicted administrator's decision] in proportion to the seriousness of the conflict." *Id.* at 1010; *see also Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 825-26 (10th Cir. 1996) (the decision will be entitled to some deference, but deference "will be lessened to the extent necessary to neutralize any untoward influence resulting from the conflict").

In an even more recent decision, the Tenth Circuit explained:

Following *Glenn*, we now weigh all conflicts of interest-be they standard or inherent-as a factor in our review. In our analysis, any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance. . . .That is, a conflict of interest affects the outcome at the margin, when we waver between affirmance and reversal.

*Hancock v. Metropolitan Life Ins. Co.*, 590 F.3d 1141, 1155 (10th Cir. 2009) (citing *Glenn*, 128 S. Ct. at 2351); *see also Scruggs v. ExxonMobil Pension Plan*, 585 F.3d 1356, 1361 (10th Cir. 2009) (discussing the sliding scale approach where the level of deference is to be decreased in proportion to the seriousness of the conflict).

I agree with Plaintiff that there are several factors which suggest a conflict of interest exists in this case. First, Ball both determines whether the employee is eligible for benefits

and also pays the entire cost of LTD benefits, since it is self-funded. (AR 637.) The Supreme Court has indicated that such dual roles create a conflict of interest. *Glenn*, 128 S. Ct. at 2346. This must be considered as a factor in determining whether the plan administrator has abused its discretion in denying benefits. *Id.* Also, Ball admits that in early 2003 Hartford became its third-party claims administrator. The Supreme Court has indicated that where the plan administrator is a professional insurance company, a conflict exists. *Id.* at 2349.

Plaintiff also points out that despite Ball's financial strength, Ball exhibited concern over money in connection with payment of LTD benefits. For example, in working with its auditors Ball expressed concern over the threat of a review of multiple employees about support for salary and LTD benefits being paid. (AR 220.) Ball exhibited concern in 2006 for pressure from auditors concerning justification for paying LTD benefits to Plaintiff in 2002 and 2003. (*Id.* 386-92.) Further, Plaintiff asserts that Declarations of Ball's personnel who were involved as Plan fiduciaries and attached to Defendants' Motion for Summary Judgment reveal financial conflicts of interest because of their participation in the success of Ball as its shareholders. Plaintiff cites evidence that the fiduciaries and consultants of the LTD Plan who worked on her claim were aware that the Plan was self-funded.

I also agree with Plaintiff that the record shows procedural irregularities which support an argument that Ball may not have been acting in the interests of the plan participants and beneficiaries, as required by a plan administrator. *Glenn*, 128 S. Ct. at 2350; *see also Fought v. UNUM Life Ins. Co. of America*, 379 F.3d 997, 1003 (10th Cir. 2004) ("'a conflict fiduciary may favor, consciously or unconsciously, its interests over the interest of the plan beneficiaries'") (quotation omitted). Serious procedural irregularities

may warrant a reduction in deference. *Id.* at 1006-07; *see also Smith v. New Mexico Coal 401(K) Personal Savings*, No. 08-2213, 2009 WL 1598454, at *7 (10th Cir. June 9, 2009).

First, it is undisputed that some documents relied on by the Plan was missing in the record submitted by Ball, and Plaintiff had to file a motion with the Court for the record to supplemented by the administrator. Notably missing is the first report of Dr. Nudelman from September 2003. While Defendants argue that this report is not relevant because it was not relied on in making a decision, the record suggests otherwise. There is record evidence that Ball did rely on that report in making its initial decision to deny LTD benefits (see December 30, 2008 Order of Magistrate Judge Tafoya, ECF No. 64 at 13-14, citing AR 576), and that Ball did not tell Plaintiff that for some time or reveal the report to her. Magistrate Judge Tafoya stated in her Order that "[i]t is beyond rational argument that this 'letter' should be part of the administrative record in this case" and that "[h]ow the file could have been purged of such an important piece of information . . .is unfathomable." (*Id.* at 14.) She also observed that Dr. Nudelman did not recommend an IME (he suggested it as a possibility only once further medical records were obtained), yet Defendants relied on him to assert that the neuropsychological IME was needed. (*Id.* at 15.)

It also appears that other documents are missing from the record. For example, Ball generated a memo about its planned investigation but included only page four of the document. (AR 522.) Similarly, EBAC minutes from March of 2004 (*id.* 758-59) contain notes summarizing Plaintiff's appeal. (*Id.* 760-61.) In those minutes Ball quoted from the March 8, 2004 report by Dr. Hammerly that ". . .the amount and type of activity that Barbara [Dubrovin] has been able to tolerate without progressive deterioration is incompatible with work at this time." (Compare AR Supp. 761 and AR 1001.) This shows that Ball had

received and reviewed this report of Dr. Hammerly yet, as found by Magistrate Judge Tafoya, that information was inexplicably left out of the record by Ball. (Order of December 30, 2008, ECF No. 64 at 18-19.) She also found that other records of Dr. Hammerly were left out of the record (*id.* at 20), and noted that it was "troubling that documentation submitted by plaintiff . . .,her attorney and her treating physician was twice omitted from the administrative record by the defendants." (*Id.* at 21).

In her Order issued December 31, 2008 (ECF No. 65), Magistrate Judge Tafoya concluded on the issue of missing documents from the record:

> Unfortunately, this court's initial review of the administrative record as filed and as supplemented by Ball does not appear to have been complete as both ordered and anticipated by the court on May 2, 2008. As noted in the Court's Order dated December 31, 2008 [Doc. No. 64], there were at least three categories of information which were not included in the administrative record filed in the court, but which were either unequivocally considered by the Plan and contained in the record at one point, or which were mailed to the Plan and should have been filed in the Claim Record: a September 30, 2003 report of Dr. Mitchell Nudelman; a letter from plaintiff to Linda Berntson, the Plan's "Manager, Welfare Plans Administration" with attached reports from plaintiff's treating physician, Dr. Hammerly; and, a letter from plaintiff's attorney, Mike Hulen, to Debbie A. Kawaguchi, "Manager, Welfare Plans Administration" with fifteen pages of medical and other information attached, again primarily from plaintiff's treating physician, Dr. Hammerly. This court considers these omissions to be a *prima facie* showing of procedural irregularities which are apparent from the face of the administrative record.

(*Id.* at 7.) I affirmed and adopted the rulings in Magistrate Judge Tafoya's Orders of December 30 and 31, 2009, in an Order filed June 16, 2009 (ECF No. 98).

Another irregularity is that while Dr. Hammerly provided a physical capacity evaluation to Ball which was received in May of 2003 (AR 138), Dr. Dibble asserted in August 2003 that there was no formal evaluation of Plaintiff's physical capacities. (AR 134-136.) This raises an inference that he may not have been provided with or aware of that

-34-

evaluation. Further, when Ball asked for an IME, it told the consultant that the Plan had already determined that Plaintiff "no longer falls under the definition of disability of our LTD Plan" after two years. (Id. 421.) However, Ball had arguably made an earlier determination that Plaintiff did fall within the definition of disability after two years (the CID) in reliance upon the evidence from Dr. Hammerly. (*Id.* 212, 530.) Ball also indicated in an e-mail to tell the auditors that it had terminated LTD benefits in 2003 because Plaintiff failed to go to scheduled IMEs. (*Id.* 392-393.) However, that was not a reason given to Plaintiff by Ball when it terminated her benefits in October 2003.

Plaintiff argues that the doctors used by Ball were not independent and that this is also a factor that should be weighed as a conflict. I do not agree. Ball showed that Drs. Dibble and Nudelman were not employees of Ball and were employed by their own companies. Plaintiff has presented no evidence that they were not independent. Further, she has cited no authority that an unsupported allegation that a doctor who is retained by the administrator is not independent is a factor that can be weighed by the court in connection with its review. The Seventh Circuit has held that it is not, at least where the conflict allegation is unsupported. *See Davis v. Unum Life Ins. Co. of America*, 444 F.3d 569, 575 (7th Cir.) (Even where the Plan retained in-house doctors to review claim, this did not create a "review-altering conflict" of interest since Unum was simply "[p]aying for a legitimate and valuable service in order to evaluate a claim thoroughly" and the plaintiff did not show "that the doctors . . . had any specific incentive to derail his claim.").

However, there is evidence that Ball knew that Dr. Nudelman did not have a specialty for CFS and used him anyway, and that it used him multiple times (in the initial claim denial and in both appeals). (AR 411.) This violates the Plan's requirement for use

of "a health care professional who has appropriate training and expertise in the field of medicine involved in the medical judgment and who had no role in the initial claim denial." (*Id.* 653). Further, when Plaintiff asked for her file, she was only given a few pages and the decisions denying her benefits, especially the initial denial letter in October 2003, did not appear to comply with the requirements of the Plan to include specific reasons and make the information available. These are more examples of procedural irregularities.

I also note on this issue that Ball admits to having ignored the favorable decision by the SSA in denying Plaintiff's appeal. It did so despite advising Plaintiff to seek such benefits and asking Plaintiff to file any necessary papers with SSA for reconsideration or an appeal of an unfavorable decision. Further, it ignored the favorable decision despite (1) indicating to Plaintiff's counsel that it would consider this information in connection with Plaintiff's disability claim; and (2) Plaintiff's counsel's advisement that it would be reasonable for Ball to first review the SSA decision before deciding whether any further IMEs were needed as it may obviate the need for such IMEs and show that an award of LTD benefits was proper under the Plan's definition. Finally on this issue, the record shows that Plaintiff wrote Ball indicating that she had been told by Ball employees that she may have to repay the company for attorneys' fees incurred in the social security decision and that she thus could not afford to hire an attorney in connection with the social security appeal. (AR 081-82.)

I find that the foregoing factors regarding the SSA decision are also suggestive of procedural irregularity and/or a conflict of interest. The Tenth Circuit addressed a similar issue in *Brown v. Hartford Life Ins. Co.*, 301 Fed. Appx. 772 (10th Cir. 2008) (unpublished decision). Brown argued in that case that Hartford improperly refused to consider the

-36-

SSA's determination that he was disabled.  *Id*.at 775.  Relying on *Glenn*, the Tenth Circuit agreed stating, "[a[ reviewing court should have factored the inconsistency created by Hartford's instructing Mr. Brown to apply for SSD and reaping the benefits of his successful determination, then summarily rejecting the evidentiary value of that decision almost without comment, into its determination of whether Hartford acted arbitrarily and capriciously in denying benefits.  *Id.* at 776 (citing *Glenn*, 128 S. Ct. at 2352).

On the other hand, I acknowledge that Ball did certain things in an effort to reduce the potential for benefit decisions to be influenced by conflicts of interest or bias.  Ball states that the costs of employee benefits are included in its contracts as overhead costs, and incorporated in the contracts Defendants have with the Federal Government and commercial customers.  (Defs.' Mot., Ex. I, Decl. of Kevin Savage, ¶¶ 2-4; Defs.' Supplemental Briefing in Support of Defs.' Mot. for Summ. J., Ex. K, Decl. of Dennis Keane.)  Therefore, Ball asserts that its profits are not affected by payment of its LTD costs, because these costs are fully recoverable as overhead costs in Defendants' contracts. (*Id.*, Ex. I, ¶ 4.)  However, I find this argument to be somewhat self-serving.  The fact that these costs may ultimately be recovered as overhead in Defendants' contracts ignores the fact that Ball is still responsible at the outset for these costs.  Moreover, if Ball did not need to seek the costs of its LTD benefits as overhead costs, because the claims for LTD benefits were denied, this would arguably increase the amount of money Ball would receive from the contract.  Thus, Ball is still impacted by these costs.

Ball also points out that its total liability with respect to the LTD plan was less than 0.03% of its costs and expenses for the years 2003-2007, and that the members of EBAC, which have ultimate decision-making authority for all LTD benefit decisions, are not

evaluated based on their duties, performance or claim decisions rendered as EBAC members. (Defs.' Mot., Exs. A & B, Declarations of Raymond Seabrook & David Westerlund.) These declarants also state that their compensation is not related to their decisions as EBAC members in granting or denying benefits under the LTD Plan, and that they consistently held less than a one percent interest in Ball's Common Stock. (*Id.*)

In weighing all of the above, while I acknowledge that Ball took steps to reduce the potential for benefit decisions to be influenced by conflicts of interest or bias, I still find that the conflict of interest and procedural irregularities described above should be given significance and weighed as a factor in my decision. I do not agree with Ball that the conflict is insubstantial to the point of vanishing. However, I also do not find circumstances that suggest a higher likelihood that the conflict affected the benefits decision in this case nor do I find a history of biased claims administration. Thus, I do not attach significant importance to the conflict, weighing it only as a factor in my decision.

      C.    <u>Evidence to Be Reviewed</u>

When the arbitrary and capricious standard of review applies, as here, the review is generally limited to the administrative record. *Hall v. UNUM Life Ins. Co. of America*, 300 F.3d 1197, 1201 (10th Cir. 2002). The court is limited to the arguments and evidence before the administrator at the time it made the decision, and may not hold a "de novo" hearing on the issue of the claimant's eligibility for benefits. *Sandoval v. Aetna Life and Cas. Ins. Co.*, 967 F.2d 377, 380-81 (10th Cir. 1992); *see also Scruggs*, 585 F.3d at 1362.

However, as previously observed by Magistrate Judge Tafoya, the Tenth Circuit has held that in an inherent conflict of interest ERISA case, a review of evidence outside the administrative record may be acceptable but extrinsic "evidence should only be admitted

to the extent that the party seeking its admission can show that it is relevant to the conflict of interest and that the conflict of interest in fact requires the admission of the evidence". (Order of December 30, 2008 at 5, ECF No. 64) (citing *Hall*, 300 F.3d at 1205). In this case, the parties submitted extrinsic evidence in connection with the conflict issues, which I have considered in evaluating what weight to give to the conflict of interest factor. *Id.* I have not, however, considered any such extrinsic evidence on the merits.

IV.    Analysis of the Merits of Plaintiff's Claims

    A.    What Constitutes Arbitrary and Capricious Conduct

As noted above, under the arbitrary and capricious standard of review, "'the court's review is limited to determining whether the interpretation of the plan was reasonable and made in good faith.'" *LaAsmar*, 605 F.3d at 796 (quotation omitted). This is a "broad standard of deference", meaning "that the plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'" *Conkright v. Frommert*, ___ U.S. ___, 130 S. Ct. 1640, 1641, 1651 (April 21, 2010) (quoting *Firestone*, 489 U.S. at 111); *see also Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999) ("The reviewing court 'need only assure that the administrator's decision fall[s] somewhere on a continuum of reasonableness—even if on the low end.'") (quotation omitted).

Indicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of law, and bad faith. *Finley v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 379 F.3d 1168, 1176 (10th Cir. 2004); *Sandoval,* 967 F.2d at 380 & n. 4. "Substantial evidence is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker.'" *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002) (quotation omitted). "In determining whether

the evidence in support of the administrator's decision is substantial, we must 'take[] into account whatever in the record fairly detracts from its weight.'" *Id.* (quotation omitted). "'The Administrator's decision need not be the only logical one nor even the best one.'" *Finley*, 379 F.3d at 1179 (quotation omitted). "It need only be sufficiently supported by facts within his knowledge to counter a claim that it was arbitrary or capricious." *Id.* "'The decision will be upheld unless it is not grounded on any reasonable basis.'" *Id.* (quotation omitted). Although Plaintiff has disputed Ball's claim that she bears the burden to show she was eligible for disability benefits, Tenth Circuit precedent has indicated otherwise, stating that the claimant bears "the burden of proving eligibility for benefits". *Hancock,* 590 F.3d at 1156 (quoting *McGee v. Equicor-Equitable HCA Corp.*, 953 F.2d 1192, 1205 (10th Cir.1992)).

B.    Whether the Decisions of the Plan Were Arbitrary and Capricious

The first issue is where to start in the analysis, *i.e.*, what decisions of Ball should be reviewed. I start with the most recent denial of Plaintiff's claims, *i.e.*, the denial of Plaintiff's second appeal based on the fact that she failed to attend the neuropsychological IME, and find that the Plan Administrator's decision on the appeal was arbitrary and capricious. I then address the Plan's initial denial of benefits in October 2003, since I also find that this decision was not reasonable. As to these decisions, I grant Plaintiff's summary judgment motion and deny Defendants' cross motion for summary judgment. Finally, I address other decisions of the Plan that Plaintiff objects to, finding that these decisions were not arbitrary and capricious. As to those decisions, I grant Defendants' summary judgment motion and deny Plaintiff's cross motion for summary judgment.

## 1.    The Denial of Benefits During the "Second" Appeal

Defendants argue that the dispute in this case is whether Ball reasonably denied Plaintiff continued LTD benefits because she breached the express terms of Ball's LTD Plan, the terms of the "LTD Agreement" she signed with Ball, and her own written commitment to comply with Plan requirements.  They assert that this is not a judicial review of the administrator's denial of a medical disability claim on the merits; it is a breach of contract case, based on a breach of the LTD Plan which is a contract of insurance governed by ERISA.  The alleged breach of the LTD Plan by Plaintiff that justified the denial of benefits according to Defendants is Plaintiff's non-attendance at the 8-hour test scheduled with Dr. Thwaites in August 2006.  The Plan required claimants to participate in "reasonable" IMEs "when and as often as" the Plan reasonably required.  (AR 728.)

More specifically, Defendants assert that in evaluating Plaintiff's eligibility for benefits under the "any occupation" standard, Ball determined that there was insufficient evidence to substantiate her inability to work and requested that Plaintiff participate in an IME in order to provide additional medical information needed to assess her medical condition and ability to work.  They argue that Plaintiff refused to attend without reason, even after Ball had offered to provide transportation for her.  They further argue that there is no support in the record for Plaintiff's claim that she was not able to attend an extended-hours test.  Instead, according to Defendants, the record establishes only that Plaintiff was unwilling to attend the IME.  As a result, it is argued that Ball acted reasonably and based on substantial evidence in upholding its decision to terminate Plaintiff's LTD benefits.

The facts relative to this appeal are stated in detail in Section II.D, *supra*.  To summarize, in September 2005 Plaintiff's counsel contacted Ball requesting another appeal

and stating that Plaintiff was now willing to undergo "any reasonable and necessary IMEs." (AR 368.) The Plan exercised its discretion in allowing this appeal, even though the Plan's provisions did not appear to expressly provide for such an appeal. Having permitted the appeal, the Plan was required to act reasonably and not in an arbitrary and capricious manner in connection with same.

When asked by the Plan why Plaintiff was previously unwilling to participate in the IME, her counsel responded among other things that she was physically unable to undergo long testing and that her diagnosis was based on CFS, not psychiatric symptoms. (AR 365.) He stated that he had advised Plaintiff to undergo appropriate medical evaluations, and asked that these be done by an "objective physician who is very experienced with chronic fatigue, fibromyalgia, and related symptoms." (*Id.*)

In January 2006 Plaintiff was notified that an IPE with a psychiatrist, Dr. Sills, was scheduled. The IME took place in April 2006. Dr. Sills concluded that Plaintiff did not suffer from any psychiatric disorder that would prevent her from working. (AR 334-43.) This assessment was forwarded to Dr. Nudelman, who reported that it did not change his earlier opinion that there was no evidence of Plaintiff's inability to work. (AR 311-15.) He also noted that Plaintiff had still not complied with a request for additional medical records, and that once those are received and reviewed, "it <u>might</u> be necessary [to] schedule an independent psychological evaluation with a full battery of tests." (*Id.*) (emphasis added).

The Plan then scheduled a neuropsychological IME to assess Plaintiff's cognitive functioning. Ball asserts that this was done because Dr. Hammerly had identified cognitive dysfunction as a basis for her inability to work, and Dr. Nudelman's January 2004 review recommended neuropsychological testing to evaluate cognitive functioning. While Plaintiff

denies that a neuropsychological IME to assess cognitive function was needed or reasonable, I find that this request was not unreasonable given the fact that: (1) Plaintiff's treating physician Dr. Hammerly had indicated that cognitive deficits were Plaintiff's primary problem, and (2) Dr. Nudelman's January 2004 report mentioned the possibility of the need for neuropsychological testing and stated that Dr. Sills' report was not adequate on the issue of psychiatric testing. (AR 313.)

An independent neuropsychological evaluation was scheduled for Plaintiff on August 9, 2006 from 8:00 a.m. to 5:00 p.m. with Gregory Thwaites, Ph.D. (AR 291.) He is not a physician. Plaintiff was not informed at that time of the reason why Ball believed this test was needed.

On August 1, 2006, Plaintiff's counsel informed Ball by letter that Plaintiff had received a favorable social security decision and, because SSA found her disabled due to CFS, not "psychological factors," the neuropsychological evaluation was irrelevant and unreasonable, particularly since Plaintiff had already undergone a psychiatric IME that had still not been provided to Plaintiff, despite request. (AR 261-62.) The letter asked that the IME be cancelled. (*Id.*) It also stated that Plaintiff was unable to participate in the scheduled eight-hour IME, or any other such IME, due to her disability, and asked that the LTD benefits be restored based upon the SSDI findings. (*Id.*)

Then began a series of correspondence between Ball and Plaintiff's counsel wherein Ball insisted that the evaluation take place and counsel insisted that Plaintiff was unable to do so and asked that the SSA's opinion be first considered by Ball before deciding whether the evaluation was necessary. (AR 260, 257-58, 252 ) Plaintiff's counsel also repeatedly advised that Plaintiff would attend a reasonable IME that would not harm

Plaintiff's health. Plaintiff ultimately did not attend the neuropsychological IME on August 9, 2006. Ball asserts that this was a breach of the LTD Agreement and a reneging on the September 2005 agreement that she would participate in IMEs requested by Ball if it provided her a second appeal opportunity.

On September 18, 2006, Ball wrote Plaintiff acknowledging that it received the SSDI determination sent by counsel. However, it denied Plaintiff's LTD benefit claim "due to the fact that [she] did not attend the scheduled IPE appointment with Dr. Thwaites on August 9, 2006." (AR 221.) The letter stated, "As indicated in the Long Term Disability Plan, on page 5, Ball may require that an independent doctor examine you. Failure to meet the Plans requirements, disqualify you from being eligible for any Long Term Disability." (*Id.*) Ball's letter also stated that the claim is closed and asked for reimbursement of the cost of $2,500 for the "no show" at the neuropsychological evaluation. (*Id.*)

Even giving deference to the Plan's decision, I find that this decision was not reasonable and was arbitrary and capricious. In so finding, I first acknowledge that under the terms of the Plan, Plaintiff was required to participate in "reasonable" IMEs "when and as often as" the Plan reasonably required. (AR 728.) Plaintiff also signed an "Agreement Concerning Long-Term Disability Benefits", prior to being asked to attend an IME, in which she specifically agreed to be examined by an independent physician when asked to do so "to determine my disability status under the terms of the Plan." (*Id.* 199.) Notwithstanding these agreements, Plaintiff obviously did not participate in the neuropsychological IME scheduled with Gregory Thwaites, Ph.D.

Nonetheless, I agree with Plaintiff that her attorney documented in the record the fact that the eight-hour IME could damage Plaintiff's health due to its length. I also find that

there was medical evidence in the record which corroborated this from her treating physician as well as statements from Plaintiff's counsel advising Ball that the length of the IME was not reasonable.

Specifically, by letter of March 8, 2004, Dr. Hammerly stated that all of Plaintiff's symptoms "seem to flare simultaneously when she attempts to engage in physical or mental activity for more than short periods of time (2 hours of sitting or 15 minutes of standing)". (AR 1001.) Similarly, by letter of June 30, 2006, Plaintiff's counsel advised Ball of the functional restrictions imposed by Dr. Hammerly including his finding that "[c]onversation greater than one hour causes fatigue & cognitive dysfunction." (*Id.* 295-96.) On August 1, 2006, Plaintiff's counsel informed Ball that "due to Ms. Dubrovin's disability, chronic pain and related symptoms, she is unable to participate in any 8 hour neuropsych (or other type of) evaluation." (*Id.* 262.) On August 8, 2006, Plaintiff's counsel again informed Ball that Plaintiff was not "physically able" to participate in the eight hour exam and stated that Ball was acting unreasonably by insisting on an 8-hour evaluation despite having received information that this would be physically and emotionally harmful to Plaintiff.

Finally, after the IME, Plaintiff's counsel wrote Ball indicating his follow-up with Plaintiff's doctor as indicated in his letter of August 8, 2006. Specifically, by letter of August 30, 2006, Plaintiff's attorney advised Ball that Dr. Hammerly had confirmed that Plaintiff could not have participated in the 8 hour neuropsychological IME Ball had scheduled. (AR 222.) He enclosed a note dated August 15, 2006 from Dr. Hammerly again stating that Plaintiff had been diagnosed with CFS and that her symptoms seem to flare when she attempts to engage in physical or mental activities for more than short periods of time. (*Id.*

224.)  In light of that, he said that the neuropsychological IME was "ill-advised if not contra-indicated."  (*Id.*)  Dr. Hammerly concluded, "[f]rom a medical perspective it would seem to make more sense to break down this prolonged, evaluation into a series of shorter exams that would be less likely to aggravate [Plaintiff's] symptoms."  (*Id.*)

Counsel's August 30 letter reiterated that Plaintiff "will participate in any reasonable and appropriate 'independent' medical evaluations requested by Ball, so long as such exams, evaluations or tests do not cause an undue physical or emotional hardship" on Plaintiff.  (AR 222.)  Counsel also stated that it "would appear . . . that the SSDI award, with cited medical support, fully meets Balls' LTD policy requirements for total disability."  (*Id.*)  Thus, he asked that Ball promptly determine that Plaintiff is disabled under the LTD plan.  (*Id.*)

All of this evidence was received by Ball prior to its September 18, 2006 decision to terminate benefits.  Further, all of the letters from Plaintiff's counsel assure Ball that Plaintiff will attend "reasonable" IMEs, just not an 8 hour IME or other IME which might hurt Plaintiff's health.

Thus, before and after August 9, 2006, Plaintiff offered her cooperation with reasonable and non-harmful IMEs and Ball refused to accommodate her, even though the Plan called for the IME to be "reasonable".  Ball's insistence that Plaintiff undergo an eight hour IME despite having evidence in the record that such a long evaluation might harm her, and its refusal to accommodate her on shorter sessions or even discuss the issue is unreasonable given the above evidence.  This is particularly true since I have found nothing in the record that refutes the above evidence or supports a finding that Plaintiff was capable of attending such a long IME.

I also find that it was unreasonable for the Plan to state the day before the scheduled IME that a doctor's note was needed to cancel the IME (AR 257), and then refuse to even discuss rescheduling the IME when Plaintiff's attorney stated that he was unable to provide a doctor's note in such a short time frame. (*Id.* 252, 254.) In other words, if Ball believed that the evidence in the record was insufficient to show that Plaintiff could not participate in the eight hour IME due to health concerns, it should have rescheduled the IME to allow Plaintiff sufficient time to obtain a doctor's note on the issue. Further, I find that the Plan acted unreasonably in scheduling the IME with someone who was not a physician when the Agreement Plaintiff signed called for a physician and this was requested by Plaintiff's counsel. Finally, I find it unreasonable that the Plan denied the claim based solely on Plaintiff's failure to attend the August IME when Plaintiff had provided further evidence from Dr. Hammerly that the IME was contra-indicated and continued to offer to participate in reasonable testing and IMEs if tests were of short duration and did not pose a threat to her health.

I further note that Plaintiff participated in a "reasonable" IME which was shorter in length (the psychiatric evaluation by Dr. Sills in the spring of 2006) and only protested to the neuropsychological exam because of its length due to health concerns. Defendants are stressing a notion that Plaintiff was uncooperative without any reasonable basis which is not supported by the record. Similarly, Ball's assertion that Plaintiff "consciously" breached an agreement or showed a lack of interest or inclination to abide by Plan requirements is not supported given the above facts.

Based on the foregoing, I find that the decision denying the appeal on the basis the Plan offered was arbitrary and capricious because it was not based on a reasonable

interpretation of the Plan's terms. *See McGraw v. Prudential Ins. Co. of America*, 137 F.3d 1253, 1259 (10th Cir. 1998). The Plan called for participation in "reasonable" IMEs, and there was evidence in the record that supported Plaintiff's assertion that the eight hour test by Dr. Thwaites was not reasonable given Plaintiff's health. Indeed, I note in a case relied on by Defendants that the court indicated in the context of a requirement that a claimant undergo IMEs that "reasonableness is a touchstone of the law, and it is no less so in the ERISA context." *Burke v. Pitney Bowes Inc. Long Term Disability Plan*, 640 F. Supp 2d 1160, 1173 (N.D. Cal. 2009), *aff'd*, 2010 WL 3258596 (9th Cir. Aug. 18, 2010). *Burke* also noted that a plan could not use a provision requiring IMEs "in an unreasonable way". *Id.* at 1174. I find that is exactly what Ball did here. Further, the agreement that Plaintiff signed with Ball requires that IMEs be performed by a physician, but Ball scheduled an IME with a non-physician. Ball violated that provision by requiring an IME with Gregory Thwaites.

I also note that Defendants rely on a straightforward breach of contract theory to support its argument, *i.e.*, that it was entitled to deny benefits based on the failure of Plaintiff to undergo an IME as required under the Plan. However, the above cited evidence actually supports a violation of the Plan by Ball. This also supports my conclusion that Ball's decision to deny Plaintiff's second appeal was arbitrary and capricious.

Finally, as further support for my finding that the Plan's decision to deny Plaintiff's second appeal was arbitrary and capricious, I note that Ball asked Plaintiff for the SSA's decision which was fully favorable to her, stated that it would be helpful in deciding her disability, and then failed to consider it before making its decision. This is despite the fact that it was advised by Plaintiff's counsel that the decision may make the need for an IME

irrelevant and that it may show conclusively that Plaintiff met the definition of disability in the Plan applicable after the first 24 months. In other words, Ball received evidence which could have shown that the IME with Dr. Thwaites was unnecessary and that Plaintiff was "totally disabled" within the meaning of the LTD Plan. Rather than consider this evidence, which may have required Ball to issue Plaintiff LTD benefits, it chose instead to deny benefits based solely on Plaintiff's failure to attend the scheduled eight hour IME.

Plaintiff's summary judgment motion which seeks a ruling that Ball acted in an arbitrary and capricious fashion and abused its discretion is thus granted as to this decision regarding the second appeal. Defendants' summary judgment motion which seeks a decision that Ball's claim decisions are reasonable is denied as to this decision.

## 2. The October 2003 Decision Suspending LTD Benefits

The record shows that in evaluating whether Plaintiff met the CID, the "any occupation" standard after 24 months, Hartford had its in-house nurse consultant review the records. After she found that the records did not answer the question, Hartford then referred the file to an outside doctor who was board certified in family medicine to conduct an independent review. That doctor, Dr. Dibble, spoke with Plaintiff's physician Dr. Hammerly and found that this conversation and the medical records did not support a finding that Plaintiff was unable to work at any occupation. Instead, he concluded, "There has been no evidence in the record of any healthcare related issue that has not been properly addressed" and "[t]here is no diagnosis . . . that would preclude [Plaintiff] from the physical demands of Sedentary Level employment." (AR 136.)

While there may be an issue of whether Dr. Dibble was provided all the information, including the physical capacities evaluation of Dr. Hammerly, I find that Ball's decision that

Plaintiff was physically capable of performing sedentary work was not arbitrary and capricious based on Dr. Dibble's report and his statements about his conversation with Dr. Hammerly. While Dr. Dibble's report ultimately contradicts Dr. Hammerly's finding that Plaintiff could not perform any work, the report provides rational support for Ball's decision that Plaintiff could physically perform sedentary work.

This is particularly true since Dr. Dibble's report appears to have been substantiated to some degree by Dr. Hammerly. Dr. Dibble states that Dr. Hammerly told him that Plaintiff's fatigue and cognitive symptoms were "very subjective" and that there had been no formal evaluation of her physical capabilities or fatigue symptomology relative to job performance or endurance. Dr. Hammerly further purportedly told Dr. Dibble that it was not part of his practice to make assessments of work capacity, and did not identify any physical limitations Plaintiff had that might interfere with sedentary employment. While a letter was sent from Dr. Hammerly to Ball responding to Dr. Dibble's statements, he stated that Dr. Dibble's report was "fine" except for the finding that Plaintiff has not had a formal evaluation for her fatigue and his belief that his casual mention of the possibility of obsessive compulsive disorder should not be included in the record. Dr. Hammerly did not challenge or respond to the other findings in the report or the ultimate conclusions.

Based on the foregoing, I find that Ball's decision that Plaintiff was physically able to perform work in October 2003 was reasonable based on the record at that time. "The judicial task here is not to determine if the administrator's decision is correct, but only if it is reasonable." *Davis*, 444 F.3d at 576-77. "[R]eaching a decision amid . . . conflicting medical evidence is a question of judgment that should be left to [the administrator] under the arbitrary-and-capricious standard." *Id.* at 578; *see also Meraou v. Williams Co. Long*

*Term Disability Plan*, No. 06-5051, 2007 WL 431515, at \*5 (10th Cir. Feb. 9, 2007) ("In ERISA cases no special deference is due the opinion of the claimant's treating physician", the fact that the plan administrators' doctors reached a different opinion than Ms. Meraou's personal physician was "not, in and of itself, a basis for reversal.").[4]

Plaintiff argues, however, that the termination of benefits was not reasonable because Defendants selected the doctors and the doctors were not independent. I reject this argument. Plaintiff has cited no evidence in support of her argument that the doctors utilized by Ball for a medical review were not independent. Further, Defendants have shown that the doctors were not employed by them and were paid consultants. I also do not find the Plan's reliance on doctors it picked to perform a records review to be unreasonable. In rejecting similar arguments the Seventh Circuit stated:

> [N]either the district court nor Davis has cited, and our research has not disclosed, any authority that generally prohibits the commonplace practice of doctors arriving at professional opinions after reviewing medical files. In such file reviews, doctors are fully able to evaluate medical information, balance the objective data against the subjective opinions of the treating physicians, and render an expert opinion without direct consultation. It is reasonable, therefore, for an administrator to rely on its doctors' assessments of the file and to save the plan the financial burden of conducting repetitive tests and examinations.

*Davis*, 444 F.3d at 577.

However, even though I find that the Plan's reliance on Dr. Dibble's opinion instead of Plaintiff's treating physician opinion to find Plaintiff was physically capable of working was not arbitrary and capricious, there is another factor that was not considered by the

---

[4] I do not think, however, that Ball's reliance on Dr. Nudelman's report from this time period to support its finding of disability was reasonable since this is not in the record and was not provided to Plaintiff. Since Dr. Dibble's opinion provided support for the Plan's decision, the reliance on Dr. Nudelman's opinion is not ultimately determinative. Nonetheless, on a remand of this case the Plan must take into account this finding and not rely in any manner on Dr. Nudelman's September 2003 report.

Plan Administrator that makes the October 2003 decision to deny Plaintiff benefits unreasonable and thus arbitrary and capricious. That is that while Dr. Dibble opined that Plaintiff should physically be able to do sedentary work, there is nothing in the record which shows that there are sedentary jobs that Plaintiff is "reasonably qualified by training, education or experience" to do, as required by the Plan. (AR 627.) The Plan does not require that Plaintiff be able to do any job, it is limited to jobs that Plaintiff is reasonably qualified for by training, education or experience. The Plan did not address that or even appear to request any opinions on the issue, simply relying in its decision denying benefits on Dr. Dibble's finding that Plaintiff could perform sedentary work.

On the issue of Plaintiff's training, education and experience, the record shows that Plaintiff is a mechanical engineer with training in spacecraft design. She worked as a Design Engineer II for BATC. The job description in the record emphasized the need for her to "[p]erform under limited supervision in a wide variety of complex engineering tasks which may include electrical, electronics, mechanical, etc. using advanced techniques and principles." (AR 31.) She was responsible for designing, developing and modifying complex aerospace applications. She needed to analyze, evaluate, and recommend innovative design approaches. She compiled and evaluated design test data. She was required to work with customers on projects. She prepared critical design reviews. She participated in the evaluation of suppliers. She analyzed and evaluated data to take corrective action. (*Id.*)

Plaintiff's position also required her to function in a demanding and challenging environment. She needed to regularly devote sustained intellectual and physical functioning. (*Id.*) The job was not simple, menial, repetitive, or clerical, and it appears that

Plaintiff was not employed in basic sedentary tasks. Her job arguably required education, training and experience far beyond what is required for most sedentary jobs. Further, the jobs that SSA found in 2001 Plaintiff could perform were menial jobs including office helper, sedentary assembler, and cashier (AR 88) that Plaintiff is not arguably qualified for by training, education or experience. I find no evidence in the record of jobs that Plaintiff was found to be able to do for which she is qualified. Accordingly, I must find that the decision to terminate benefits in 2003 was unreasonable and arbitrary and capricious.

In that regard, courts have made clear that the plan administrator must not only evaluate whether a claimant can physically perform the requirements of work, but must also consider whether there are jobs that the claimant can do from a vocational perspective. As noted by the Second Circuit, the administrator must undertake both a physical capacity analysis-"whether the applicant is physically capable of further employment" and a "vocational capacity analysis-whether the applicant is vocationally qualified for any further employment of which she is physically capable". *Durakovic v. Building Serv. 32 BJ Pension Plan*, 609 F.3d 133, 141 (2d Cir. 2010). In that case, the plan provided that a claimant was eligible for disability benefits if he or she was "totally and permanently unable ... to engage in any further employment or gainful pursuit". The Second Circuit held that this required the administrator to determine not only whether the claimant was physically able to do the job, but whether it actually existed in the national economy and whether the plaintiff could "'earn a reasonably substantial income from her employment, rising to the dignity of an income or likelihood.'" *Id.* at 142 (quoting *Demirovic v. Building Service 32 B-J Pension Plan*, 467 F.3d 208, 215 (2d Cir. 2006)).

In *Demirovic*, the Second Circuit found that the plan administrator's review of the plaintiff's claim "suffer[ed] from a . . . fundamental flaw" where it determined "that Demirovic is *physically* capable of performing some form of sedentary work", but appeared to give "no consideration whatsoever to whether Demirovic could in fact find such sedentary work." *Id.*, 467 F.3d at 212-13 (emphasis in original). It noted that "[a] determination of 'employability' cannot be purely a medical diagnosis, and a finding that a claimant is physically capable of sedentary work is meaningless without some consideration of whether she is vocationally qualified to obtain such employment." *Id.* at 213, 215. In so finding, it noted that it joined the other circuits to have considered the issue. *Id.*

*Demirovic* relied on part in the Tenth Circuit's decision in *Torix v Ball Corp.*, 862 F.2d 1428 (10th Cir. 1988), a case obviously involving Defendant Ball. *Torix* also made clear that "a reasonable interpretation of a claimant's entitlement to payments based on a claim of 'total disability' must consider the claimant's ability to pursue gainful employment in light of all the circumstances." *Id.* at 1431. It stated that "[t]he standard to be applied will require the claimant to establish a physical inability to follow any occupation from which he can earn a reasonably substantial income rising to the dignity of an income or livelihood, although the income may not be as much as was earned prior to the disability." *Id.* "If plaintiff meets his burden, recovery may not be denied on the basis of overly restrictive interpretations of the plan's language." *Id.*

In a very recent unpublished decision, the Tenth Circuit clarified that the determination of whether a vocational or occupational assessment is required by the plan administrator "is decided on a case-by-case basis". *Null v. Community Hosp. Ass'n*, No. 09-6125, 2010 WL 2011558, at *4 (10th Cir. May 12, 2010) (quoting *Caldwell*, 287 F.3d at

1289).  *Caldwell* held on that issue that "[i]f a claims administrator can garner substantial evidence to demonstrate that a claimant is, in fact, able to perform other occupations (within the definition set out by the insurer) in the open labor market, then consideration of vocational expert evidence is unnecessary."  *Id.*, 287 F.3d at 1290.  Thus, vocational evidence is not required in every case, but there must be other evidence in the record that shows there are available occupations for which the claimant is qualified.

The holdings in the above cited cases generally involved language in a plan that required the claimant to be unable to work at "any occupation" or "any employment" in order to obtain benefits.  Here, however, the Plan's provisions required not only that the claimant be unable to work at "any occupation", but that the occupation be one for which the claimant is reasonably qualified by education, training and experience.  Under this more onerous standard, it is obviously even more important for the plan administrator to show through vocational or other substantial  evidence that such jobs exist for the claimant.  *See Sanders v. Unum Life Ins. Co. of America*, No. 3:08-CV-03(CDL), 2009 WL 902046, at *9 (M.D. Ga. March 30, 2009) (decision denying benefits by administrator was arbitrary and capricious because, among other things, "Defendant's vocational consultants failed to take into account Plaintiff's education, training, and experience in determining which, if any occupations Plaintiff would be able to perform").

I find this to be particularly true in this case where Plaintiff had training, education and experience involving a very skilled engineering position.  Under this circumstance, I believe that vocational testimony would be required on the issue of whether there are other occupations for which Plaintiff is qualified by her training, education and experience.

Indeed, the Tenth Circuit addressed this issue in *Holcomb v. UNUM Life Ins. Co. of Am.*, 578 F.3d 1187 (10th Cir. 2009). In that case, as here, after 24 months of payments the plan defined a claimant as disabled if she was unable to perform the duties of any occupation for which she was reasonably fitted by education, training or experience. *Id.* at 1188. The Tenth Circuit found that the administrator's decision was not an abuse of discretion because in addition to evidence from medical providers indicating that the plaintiff was able to work, UNUM "performed both vocational assessments and occupational analyses" which "concluded that she was fit for multiple gainful occupations that reasonably matched her education, training, and experience." *Id.* at 1193-94.

I also find the Seventh Circuit's decision in *Davis* instructive. There the court found that a plan administrator's decision to find a claimant disabled under a similar standard to the one at issue (whether the claimant was unable to perform the duties of any gainful occupation for which he was reasonably fitted) was reasonable when the administrator relied on expert opinions of doctors it consulted who established that Davis could perform sedentary activities as well as the opinion of a vocational specialist who identified several sedentary jobs for Davis. *Davis*, 444 F.3d at 576 (emphasis added). In other words, the decision was reasonable because there was rational support in the record from a vocational specialist who identified jobs that the plaintiff was qualified to do. This evidence made "it 'possible' for Unum 'to offer a reasoned explanation' for its decision to deny benefits, and, under the arbitrary-and-capricious standard, we must respect Unum's judgment." *Id.*; *see also Heller v. Fortis Benefits Ins. Co.*, 142 F.3d 487, 494 (D.C. Cir. 1998) (finding that there was not a genuine question of material fact as to the availability of employment for which

Heller would have been "reasonably fitted by education, training or experience," as required by the plan based on a vocational assessment in the record).

Here, unlike *Holcomb* and *Davis*, Ball has pointed to no evidence of any kind, from a vocational consultant or otherwise, that there was sedentary or other work that Plaintiff could perform for which she was reasonably qualified by training, education or experience. While this may not ultimately be determinative since the final decision was made on the appeals of this decision, I still find it is evidence of arbitrary and capricious behavior that must be properly considered when the case is remanded to the Plan Administrator. In other words, before the Plan Administrator can find that Plaintiff is not disabled under the "any occupation" standard, there must be record support that there are occupations that Plaintiff can physically perform for which she is reasonably qualified by training, education or experience.

Based on the foregoing, Plaintiff's Motion for Summary Judgment is granted as to this decision and Defendants' Motion for Summary Judgment is denied.

### 3. Other Arguments by Plaintiff

#### A. Hartford's Decision to Reopen the Issue of the CID

Plaintiff also argues that it was unreasonable in 2003 for Hartford to reopen the issue of whether she met the CID definition after more than three years of receiving LTD benefits. I reject this argument.

As set forth previously, Ball's LTD Plan recognizes two categories of disability. First, a claimant is eligible to receive LTD benefits if he or she is not able to perform his or her usual job during the first two years of the disability, *i.e.,* an "own occupation" standard. After the second year, the claimant must be unable to perform any job for which he or she

is reasonable qualified by training, education, or experience, *i.e.,* an "any occupation" standard. (AR 627.)

In this case, while there is evidence that Ball found that Plaintiff met the "any occupation" standard based on Dr. Hammerly's statement in early 2002 that Plaintiff was totally disabled, that document noted that the decision was made in January 2004, before the 24 month cutoff of March 6, 2004, and stated in a handwritten note that it applied only through May 2004. Further, the note does not indicate that there was any type of detailed consideration of the issue. When Hartford took over the claim, it relied on its nurse who reviewed the records and found that there was no such determination in the record.

Under the above circumstances, I find it was reasonable for the Plan to reopen the issue and have a determination made as to whether Plaintiff met the "any occupation" standard (as compared to the "own occupation" standard). This was not arbitrary and capricious, even though Plaintiff had been receiving benefits for such a long period, particularly since under the Plan Plaintiff was required to show an ongoing disability. See *Holmstrom v. Metropolitan Life Ins. Co.*, ___ F.3d ___, 2010 WL 3064870 , at *7 (7th Cir. Aug. 4, 2010) (previous payment of benefits by the administrator is just a factor "to be considered in the court's review process; it does not create a presumptive burden for the plan to overcome) (citing cases); *Ruple v. Hartford Life and Acc. Ins. Co.*, 340 Fed. Appx. 604, 613 (11th Cir. 2009) (payment of benefits was not binding where the policy required claimant to produce evidence of an ongoing disability and "[n]othing in the policy stated or implied that once long-term benefits were granted, the claimant would forever be entitled to them"). Plaintiff's Motion for Summary Judgment is thus denied and Defendants' Motion for Summary Judgment is granted as to this decision.

B.    Ball's Decision to Obtain Peer Reviews to Determine Whether
      Plaintiff Met the "Any Occupation" Standard After 24 Months

The next question I address is whether it was reasonable for Ball to find that the medical evidence was inconclusive on the issue of whether Plaintiff was disabled under the "any occupation" standard and to obtain peer reviews.  I find that it was and reject Plaintiff's argument that this decision was arbitrary and capricious.

I agree with Plaintiff that it is undisputed the record contained Dr. Hammerly's findings that Plaintiff was totally and completely disabled due to CFS/CFIDS from performing any occupation for which she was reasonable qualified by training, education, or experience, *i.e.,* an "any occupation" standard.  (AR 627.)  Nonetheless, I find it was still reasonable for the Plan Administrator to have "independent" physicians conduct a records review on the issue.  Even Plaintiff acknowledges that a plan administrator is not bound by a claimant's treating physicians' opinions and is entitled to obtain its own determination of disability.

As noted by the Seventh Circuit, "'courts have no warrant to require administrators automatically to accord special deference to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.'" *Davis*, 444 F.3d at 578 (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)).  *Davis* further noted, "plan administrators have a duty to all plan participants and beneficiaries to investigate claims and make sure to avoid paying benefits to claimants who are not entitled to receive them." *Id.* at 575.  "[A]n administrator's decision to "seek[ ] independent expert advice is evidence of a thorough investigation." *Id.*; *see also Barnhart v. UNUM Life Ins.*

*Co. of America*, 179 F.3d 583, 589 (8th Cir. 1999) ("UNUM acted prudently on behalf of all beneficiaries by not accepting at face value the medical evidence as submitted by Barnhart, but by conducting a further inquiry into her claims of disability").

Plaintiff also argues that Ball improperly required objective tests to prove her condition which do not exist as to diagnosing CFS. Indeed, Defendants rely on the fact that record reviews by Drs. Dibble and Nudelman established the fact that Plaintiff's many laboratory tests and physical exams consistently had normal results, arguing that this means there was insufficient medical evidence to demonstrate that Plaintiff was physically unable to perform a sedentary occupation. I agree with Plaintiff that to the extent that Ball relied on suggestions from medical providers that there needed to be objective tests that measured the existence of her CFS condition, this was improper as such a condition is not diagnosed or measured by such tests. *See Sisco v. United States Department of Health and Human Servs.*, 10 F.3d 739, 741-44 (10th Cir. 1993); *Clausen v. Standard Ins. Co.*, 961 F. Supp. 1446, 1456 (D. Colo. 1997).

Here, however, it appears that Ball was seeking objective evidence demonstrating that Plaintiff was unable to work, *i.e.*, about whether she was disabled, not objective evidence substantiating her diagnosis of CFS. (*See* AR 138, 146, 257, 611.) The issue of whether there are objective measurements on the issue of a claimant's ability to work based on such impairments is a different issue and is properly considered by the plan.

This case is similar to the facts presented in the *Meraou* decision by the Tenth Circuit. *Meraou*, 2007 WL 431515, at *7. The claimant argued in that case that the consultants' opinions were flawed because they required objective testing to indicate that conditions such as fibromyalgia existed, and that it should have been unnecessary to

provide such testing in light of the diagnoses from her own doctors over the years. *Id.* The Tenth Circuit found that her argument "rests in large part on a misunderstanding of the consultants' opinions." *Id.* "Objective evidence, in their opinion, was necessary primarily to confirm the *disabling severity* of these conditions." *Id.* That is also the case here, where Ball requested evidence to confirm that Plaintiff's impairments were disabling.

As noted by the Ninth Circuit, "a medical diagnosis does not by itself establish a disability," and the claimant must "establish[] that her fibromyalgia disable[s] her from working." *Jordan v. Northrop Grumman Corp.*, 370 F.3d 869, 877, 880 (9th Cir. 2004). Thus, "while the *diagnoses* of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis". *Boardman v. Prudential*, 337 F.3d 9, 17 n. 5 (1st Cir. 2003).

Accordingly, "it is entirely reasonable for an insurer to request objective evidence of a claimant's functional capacity" or "disability", notwithstanding a diagnosis of fibromyalgia or CFS. *Rose v. Hartford*, No. 07-5423, 2008 WL 648965, at *9 (6th Cir. March 11, 2008) (citing *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 166 (6th Cir. 2007)). "One method of objective proof of disability, for instance, is a functional capacity evaluation, 'a reliable and objective method of gauging' the extent one can complete work-related tasks." *Huffaker v. MetLife*, No. 07-5410, 2008 WL 822262, at *6 n. 2 (6th Cir. March 25, 2008) (quoting *Cooper*, 486 F.3d at 176); *see also Corry v. Liberty Life*, 499 F.3d 389, 401 (5th Cir.2007) (administrator's actions proper where it accepted diagnosis of fibromyalgia, but did not accept claim of disabling effects of same); *Forrester v. MetLife*, No. 04-1204, 2005 WL 3429542, 13 (D. Kan. Dec, 8, 2005) (administrator's denial of benefits reasonable

where there was no objective evidence of functional limitations associated with fibromyalgia syndrome).

Based upon the foregoing, I find that the Plan Administrator's decision to obtain peer reviews to determine whether Plaintiff met the "Any Occupation" Standard Applicable after 24 months was not arbitrary and capricious.

C.    The Plan's Denial of Plaintiff's First Appeal

Finally, I find that Ball's denial of the first appeal was not arbitrary and capricious. As to that decision, on January 30, 2004, relying on the review and report of Dr. Nudelman earlier that month, Ball wrote Plaintiff informing her that there was inadequate support to find her medically disabled from performing any occupation for which she was reasonably qualified.  (AR 611.)   Plaintiff asserts that the independent record review of Dr. Nudelman in January 2004 did not provide any facts to challenge the evidence from Dr. Hammerly which Ball had previously accepted in finding Plaintiff was entitled to benefits.   However, Dr. Nudelman opined from his record review that Plaintiff's medical information did not contain documentation showing that she had undergone any: (1) sleep studies which would be necessary to accurately evaluate the basis of her fatigue–a primary reason for her inability to work according to Dr. Hammerly; (2) neuropsychological testing to assess the degree of cognitive impairment–the other primary reason for Plaintiff's inability to work according to Dr. Hammerly; or (3) psychiatric evaluations for mental health issues.  (AR 573-74.)

I acknowledge, however, that the Plan procedurally erred in using Dr. Nudelman again during the appeal.  The Plan provides that during an appeal if a medical judgment is involved, the Plan is supposed to use "a health care professional who has appropriate

training and expertise in the field of medicine involved in the medical judgment and who had no role in the initial claim denial." (AR 653). The appeal is also supposed to "be reviewed by a Plan fiduciary who had no role in the initial claim denial and the review will be an independent one without giving the original denial any special consideration." (*Id.*) It appears that Ball did not do this since Dr. Nudelman was involved in the initial review as well as the appeal. Further, it appears that Dr. Nudelman may not have expertise in the area of CFS. While these are procedural irregularities that I have weighed, they do not ultimately impact my decision that the denial of this appeal was reasonable.

That is because I find that the reliance on Dr. Nudelman's report to deny the appeal is not determinative since the Plan acted reasonably in thereafter accommodating Plaintiff's request for reconsideration of her appeal. On March 23, 2004, EBAC reviewed Plaintiff's claim and determined that an IME was necessary to fully assess Plaintiff's condition and ability to work. (AR 759-61.) On March 30, 2004, Ball sent a letter stating that EBAC had recommended that Plaintiff participate in an IME. (*Id.* 571.) It asked Plaintiff to go to an IME to be scheduled by Ball, and stated that the results of the IME would be considered in making a final determination on her appeal. (*Id.*)

While Plaintiff argues that the IME was not necessary, as Dr. Nudelman saw no need at that time for an IME, I find that the Plan's decision to have Plaintiff participate in a psychological IME was not unreasonable, even when Dr. Nudelman's report is not considered. First, according to Dr. Dibble's report, Dr. Hammerly had told him that Plaintiff had not had a formal psychiatric evaluation to rule out depression/mental illness, and that he had considered a diagnosis of obsessive compulsive disorder at various times. (AR 136.) Second, when Dr. Hammerly responded to Dr. Dibble's report, he stated that his

"casual" mention of the possibility of obsessive compulsive disorder was not something he thought should be included in the record *until* Plaintiff had an official psychiatric evaluation. (*Id.* 152) (emphasis added). Finally, Dr. Hammerly had opined that Plaintiff's cognitive impairments were her most disabling symptoms.

Thus, nearly a month in advance, Plaintiff was informed that she was scheduled to meet with Monti Atkinson on May 4 and 11, 2004 from 1:00- 5:00 for an IME. (AR 416.) Plaintiff failed to attend the IME even though the Plan Administrator advised that it would provide for transportation due to Plaintiff's stated health concerns. As a consequence of her failure to participate in an IME, on June 1, 2004, Ball informed Plaintiff that, because she failed to comply with the terms of the Plan, her appeal was being denied. (*Id.* 406-408.) Ball stated that because it was Plaintiff's responsibility under the terms of the Plan to prove her eligibility for benefits, her refusal to participate in the requested IME meant that she failed to demonstrate that she qualified for continued benefits. Ball could not establish that Plaintiff was disabled; thus, there was no basis for Ball to continue her benefit payments under the terms of the Plan. (*Id.* 407.)

I find that this decision based on Plaintiff's failure to attend the IME was not unreasonable given the fact that Plaintiff never attempted to substantiate her claim that she could not attend the IME due to poor health. She did not point to any evidence in the record from Dr. Hammerly to justify her failure to attend nor did she request that she be allowed to present medical evidence which excused her attendance. Thus, I find it was reasonable for Ball to assume that Plaintiff simply chose not to attend. That is a very different situation than presented in connection with Plaintiff's second appeal where her

attorney documented the concerns over the length of the IMEs on Plaintiff's health and provided medical evidence on the issue, as discussed earlier.

Moreover, even if Ball had acted unreasonably in denying this appeal based on Plaintiff's failure to attend this IME, the termination letter stated that if Plaintiff was willing to attend the IME and any follow-up IME's that were needed and agree to extend the time period within which the Committee was required to decide the appeal, the appeal would be "held in abeyance." (*Id.* 408.). Thus, Ball expressly told Plaintiff that the decision denying her appeal would be held in abeyance if she attended an IME, giving her another chance to do so before her benefits were denied. Ball then heard nothing from Plaintiff on this issue within the time period required to decide the appeal. Plaintiff failed to communicate that she would attend an IME, and again failed to provide any evidence or statement as to why her health precluded attendance at the IME.

Based on the foregoing, I find that Ball's decision to deny the first appeal was reasonable and was not arbitrary and capricious. Plaintiff's Motion for Summary Judgment is thus denied as to this decision. Defendants' Motion for Summary Judgment is granted as to this decision.

V.   CONCLUSION

In conclusion, I find that the Plan acted in an arbitrary and capricious manner in denying the second appeal based solely on the fact that Plaintiff refused to attend an eight-hour neuropsychological IME with a non-physician. I also find that the Plan acted arbitrarily and capriciously in connection with the initial denial of the claim in October 2003 because it never determined from a vocational perspective whether there were jobs available that Plaintiff could perform for which she was reasonably qualified by training, education and

experience.  I find that the remaining decisions of the Plan which Plaintiff contests were reasonable and were not arbitrary and capricious.

Based on the foregoing, Plaintiff's Motion for Summary Judgment on the Merits Based Upon Judicial Review Under ERISA is granted in part and denied in part consistent with my rulings in this Order.  Defendants' Motion for Summary Judgment is also granted in part and denied in part consistent with the rulings in this Order.  Since this ruling impacts only the first claim, the second claim for relief remains to be resolved.  Once it is resolved, this case will be remanded to the Plan Administrator with directions for it to provide a reasonable IME for Plaintiff that accommodates her health concerns, that the IME be conducted by a physician with expertise as to her medical conditions, and that Ball then decide the appeal on the merits.  Further, the Plan Administrator will be advised that in making its decision, it must determine, not only whether Plaintiff can physically perform jobs, but whether from a vocational perspective there are jobs available for which she is reasonably qualified by training, education and experience, taking into account any relevant vocational factors.

It is therefor

ORDERED that Plaintiff's Motion for Summary judgment on the Merits Based Upon Judicial Review Under ERISA (ECF No. 117) is **GRANTED IN PART AND DENIED IN PART** consistent with this Order.  It is

FURTHER ORDERED that Defendants' Motion for Summary Judgment (ECF No. 108) is **GRANTED IN PART AND DENIED IN PART** consistent with this Order.  Finally, it is

ORDERED that on or before **Wednesday, October 13, 2010,** the parties shall file a status report as to the second claim for relief and what action needs to occur as to same.

Dated:  September 29, 2010

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge